FRED R. BAKER v. THE STATE.

No. 5823.  Decided June 1, 1921.

Rehearing Denied April 26, 1922.

1.—Medical Practice Act—Optometry Practice Act—Repeal—Practice in Trial Court.

Where defendant was convicted of acts under the medical practice Act, which no longer are offenses by the express terms of the optometry Act of the Thirty-Seventh Legislature, this court is constrained to hold that Article 16, Penal Code, which provides that the repeal of a law where the repealing statute substitutes no other penalty will exempt from punishment all persons, etc., at any state before final judgment, inures to the benefit of appellant, and the judgment must be reversed and the case dismissed.

2.—Same—Optometry Act—Statutes Construed—Discrimination—School of Medicine.

Where the State, on motion for rehearing, contended that the judgment in the original opinion of this court, practically held against the State Constitution, forbidding preference by law to any school of medicine, but no such preference is given in said optometry bill as passed by the Thirty-Seventh Legislature for such school of medicine, there is no reversible error.

### 3.—Same—Legislative Intent—Legislative Power.

The legislature has power to prescribe the duties of nurses opticians, and of optometrist, and also to define those things which shall constitute the practice of medicine in this State; and may make a part of its definition of the practice of optometry, or the duties of opticians a distinction between the powers and duties of same and those which are to be considered as the practice of medicine, and this is all that it has attempted.

Appeal from the County Court of Dallas. Tried below before the Honorable T. A. Work.

Appeal from a conviction of unlawfully practicing medicine; penalty, a fine of $50, and one day imprisonment in jail.

The opinion states case.

*Barry Miller*, for appellant.—Cited Martin v. Baldy, 94 Atl. Rep., 1092. Rex v. Harvey, 16 Ont. Weekly Rep., 433; People v. Smith, 208 Ill., 31, and cases cited in opinion.

*R. G. Storey*, Assistant Attorney General, and *Charles L. Black*, for the State.—Cited Newman v. State, 58 Texas Crim. Rep., 223; Dardell v. McBride, 92 Texas, 239; Stone v. State, 48 Texas Crim. Rep., 117, and cases cited in opinion.

MORROW, PRESIDING JUDGE.—The conviction is for violation the Medical Practice Act. (See Chap. 6, Title 12 of the Penal Code.) It is declared that it shall be unlawful for any one to practice medicine in any of its branches upon human beings, within the limits of the State, who has not complied with the provisions of the law prescribing examination and registration of certificate. Certain persons are exempted. Among them are dentists, who confine their practice to dentistry, nurses who practice nursing only, and masseurs in their particular sphere of labor.

The information contains the following:

". . . did unlawfully examine the eyes of F. F. McHenry by means of a trial case, test card, charts and with a retinoscope, phorometer, opthalmometer, and ophthalmoscope for the purpose of determining whether it was necessary for the said F. F. McHenry to use glasses for the optical requirements of his eyes and the kind, character and nature of such glasses and did by such examination determine that the optical condition of his eyes required a certain

kind of glass and did determine the formula thereof and did make such glasses in compliance with such formula and did then and there make a charge for his services in making such examination and making the glasses called for by such examination and the said F. F. McHenry did then and there pay him the charges so made which acts herein set forth constituted the practice of medicine as defined by Article 755 Revised Penal Code 1911 of the State of Texas.''

It was shown that the appellant examined the eyes of one McHenry, from whose testimony we quote:

''. . . he then and there examined my eyes by means of a trial case, test cards and charts, and with the retinoscope, phorometer, opthalmometer and opthalmoscope to determine proper glasses for the optical requirements of my eyes, and did determine the formula of, and provide me with, such glasses and charged therefor.

''He stated to me that he was not a doctor of medicine and did not treat diseases or practice medicine or surgery, that he was an optometrist and optician and fitted glasses only for the purpose of providing an optical adjustment of rays of light by means of lenses, before the rays enter the eye, so that these rays would, on entering the eye and after refraction thereby, conform to the optical requirements of such optically imperfect eye, as in case of Myopia, Hypermetropia, Astigmatism, or any error of eye refraction, thus giving improved or more comfortable vision.''

Appellant said that optometry was taught in certain colleges as a branch of the Department of Physics and not in the Department of the Science of Medicine; that it was a branch of the Science of Physics. He said:

''My business is to fit glasses on defective eyes to correct defective vision or what is commonly called refractive errors. I do not and have never undertaken to treat diseases of the eye. When I find such condition of the eye I refer the case to a physician.''

Concerning the apparatus used, an expert testified on behalf of the appellant. He described the purpose of the ''test-card'' to determine the exact acuity. The ''ophalmoscope'' consists of a mirror which enables the examiner to see the interior of the eye, giving the view of the media through which the light passes and a view of the retina or back part of the eye in which the rays of light are brought to a focus. The witness said:

''When we look into the eye through the instrument and find that it is not a healthy eye, we will not treat it but refer it to a physician.''

The ''retinoscope'' is described as a mirror with a hole in the center by which, when used by the operator, light and dark spaces might be discerned and by which one familiar with the mathematical and physical principles involved could determine the nature of the lense required, and ''whether the eye is near-sighted or far-sighted, that is,

whether it is an astigmatism or hypermetropic." The "phorometer" is designed to determine the muscular state of the eye, that is, the extrinsic muscles, the eye being controlled by six muscles. By the use of this instrument the operator will be able to "determine whether or not the muscles are in their proper relationship."

While the State might not unjustly discriminate or include in the definition an entirely unrelated occupation, it has the power to determine and declare what constitutes the practice of medicine. Collins v. Texas, 223 U. S. Rep. page 295; Smith v. People, 36 L. R. A. (N. S.) 160. This it has done in Penal Code, Article 755. It has also defined the scope of the examination thus:

"Examinations shall be conducted on the scientific branches of medicine only, and shall include anatomy, physiology, chemistry, histology, pathology, bacteriology, physical diagnosis, surgery, obstetrics, gynecology, hygiene, and medical jurisprudence." Revised Civil Statutes, Art. 5741.)

Supporting his contention that neither in allegation nor proof do the acts of appellant come within the purview of the statute, appellant cites Rex v. Harvey, 16 Ont. Weekly Rep. 433; People v. Smith, 208 Ill. 31; Martin v. Baldy, 94 Atlantic Rep. 1092; Ex parte Rust, 183 Pac. Rep. 548. The lack of uniformity in the statutes in the various states in defining the practice of medicine qualifies the value of the decisions of other states in solving the question presented and, moreover, an examination of the cases cited reveals a variation from the facts involved in the case in hand. For example, in People v. Smith, 208 Ill. supra, the court said:

"The finding of the Appellate Court is, that all the defendant did was to fit spectacles to the eyes of persons of defective vision and sell them to such persons. By so doing he did not treat, operate upon or prescribe for any physical ailment or injury or deformity of another, within the meaning of section 7."

And further reference to Section 8 is said:

"It would be a strained construction of that section to hold that the mere fitting of spectacles to the eyes of a person is an appliance intended for the treatment of diseases or injury of another."

The instant case is one in which the appellant was not a mere vendor of spectacles but charged a fee for the examination and opinion.

The case of Martin v. Baldy, 94 Atlantic Reporter, 1092, decided by the Supreme Court of Pennsylvania, construed the statute in these terms:

"It shall not be lawful for any person in the State of Pennsylvania to engage in the practice of medicine and surgery, or to hold himself or herself forth as a practitioner in medicine and surgery, or to assume the title of doctor of medicine and surgery, or doctor of any

specific disease, or to diagnose diseases, or to sign any death certificate, or to hold himself or herself forth as able to do so." (See Laws of Pennsylvania, 1911, page 639.)

We quote from the opinion:

"We cannot regard the fact that the work done by the specialist physician and that done by the optometrist, to a certain limit and extent, lap over each other, constitutes the optometrist a practitioner in medicine."

"The proofs in the case are to the effect that the optometrists, examining the eye of a patient either with or without the aid of artificial means, in case they find that the interior of the eye is clouded and gives ground for suspicion that there is some disease of the eye, informs the patient that, for his own protection and safety, he should consult a physician. We understand that under such circumstances the optometrist declined to furnish lenses for the patient. Now, is that diagnosing disease?

We have had a variety of definitions given, from various lexicographers and from eminient physicians. The word, etymologically and in its general interpretation, signifies, as we understand it, a discrimination, a passing of judgment, as to physical conditions. In a sense, we suppose it may be said that a mother having a child giving signs of whooping cough or some febrile condition passes judgment upon the case. Is that diagnosis within the meaning of the statute?"

"The optometrist does not undertake to determine what disease, if any, exists in an eye which he examines. According to the proofs, it is sufficient reason for a reference of the case to a physician, if there is that which gives him reasonable grounds for suspecting that a disease exists. It seems to us that it would be applying a severe rule and stretching language beyond its nature force if we should say that such action on the part of an optometrist is 'diagnosing diseases.'"

In its ordinary sense, the practice of medicine is the application of the knowledge of that science. The laws of all states define and regulate it, but not in the same manner and terms. That is to say, in each of the states, one who would exercise the profession of medicine must perform certain conditions precedent which are named by the statute; and a definition is made embracing all branches of the profession save those that are excepted or placed in a separate class. Those qualifying for the practice of the medical profession in its full scope are permitted to practice any of its branches; for example, the oculist, limiting his practice to the eye, having qualified under the general practice act, may, without further requirements, practice what is known as optometry. The optometrist, however undergone the examination required for the exercise of that science, which examination is less comprehensive than that prescribed for the practice

of medicine, may not engage in the general practice of medicine but must confine himself to the practice of optometry, as defined by the statute in the particular state.

The laws regulating the practice of medicine in all of its branches rest upon that phase of the police power which concerns the public health. In states in which the practice of optometry is recognized as a fit subject for classification and regulation, the laws defining it and prescribing qualifications for its pursuit are upheld upon this phase of the police power; for example, in Ex parte Rust, 183 Pacific Reporter, 548; the Supreme Court of California, upholding the optometry law, said:

"The same considerations of public health which justified the requirement of a license to practice medicine and surgery and osteopathy authorizes the legislation in question."

The validity of the California law was, upon the same principle, sustained by the Supreme Court of the United States. McNaughton v. Johnson, 242 U. S. Rep., 344. On the other hand, the Supreme Court of Illinois, in People v. Smith, 208 Ill., 31, having held that optometry was not a branch of the practice of medicine, that court, in the case of People v. Griffith, 117 N. E. Rep., 195, held invalid the optometry law upon the ground that, it being not within the scope of the practice of medicine, was not a subject concerning the public health, and consequently its regulation was not within the power of the Legislature. The decision of the Supreme Court of Pennsylvania, in Martin v. Baldy, 94 Atlantic Rep. 1092, leaves that state in practically the same class as Illinois. However, in the Pennsylvania case it is intimated that there could be a regulation of optometry.

We learn from the brief of both the appellant and appellee that except in the states just mentioned and Texas, the practice of optometry is classified, defined and regulated in each of the states of the Union. The definition in all of them is not before us. Some are found quoted in McNaughton v. Johnson, Amer. & Eng. Ann. Cases, 1917B, page 802.

The Utah statute reads thus:

"The practice of optometry is the employment of subjective and objective mechanical means to determine the accommodative and refractive conditions of the eye and the scope of its functions in general and the application and adjustment of lenses for the correction of errors of refraction, the relief of eye strain, and the aid of vision."

In the statute of out State the subject of optometry is not mentioned. It is either embraced in the Medical Practice Act or it is unregulated. The scope of the provision of the Penal Code (Art. 755) defining the practice of medicine is extremely broad.

"Any person shall be regarded as practicing medicine within the meaning of this act;

(1) Who shall publicly profess to be a physician or surgeon and shall treat, or offer to treat, any disease or disorder, mental or physical, or any physical deformity or injury, by any system or method, or to effect cures thereof.

(2) Or who shall treat, or offer to treat, any disease or disorder, mental or physical, or any physical deformity or injury, by any system or method or to effect cures thereof, and charge therefore, directly or indirectly, money or other compensation.''

Concerning it, the Supreme Court of the United States, in the case of Collins v. Texas, 225 U. S. Rep. 295, said:

''We are far from agreeing with the plaintiff in error that the definition of practising medicine is arbitrary or irrational, but it would be immaterial if it were, as its only object is to explain who fall within the purview of the act.''

''An osteopath professes to help certain ailments by scientific manipulation affecting the nerve centers. It is intelligible, therefore, that the state should require of him a scientific training. . . . He, like others, must begin by a diagnosis. It is no answer to say that in many instances the diagnosis is easy,—that a man knows it when he has a cold or a toothache. For a general practice science is needed.''

This court has construed the statute with reference to healing by prayer and laying on of hands, to the chiropractic and the osteopath, and its effect thus defined:

''In the first place, we want to call attention to the fact that the Medical Practice Act does not seek to regulate how any one shall treat diseases or disorders; it simply provides that, before any one shall treat or offer to treat diseases for the human family, he shall demonstrate that he is well grounded in certain studies named in the Act. This is to compel a person to show that he has a knowledge of the human frame, the organs of the body, and an ability to diagnose diseases, etc. . . . The misconception of the terms of the Medical Practice Act has been the basis of much argument.'' Singh v. State, 66 Texas Crim. Rep., 156; 146 S. W. Rep. 891; Teem v. State, 79 Texas Crim. Rep., 295; 183 S. W. Rep. 1144; Newman v. State, 72 Texas Crim. Rep., 267; 163 S. W. Rep. 427; Lewis v. State, 69 Texas Crim. Rep., 593; 155 S. W. Rep., 523.

In pursuing his avocation, the optometrist examines the eyes of those seeking his advice with the object of determining whether they properly perform their functions. If he decides they are not and determines that their failure to do so is due to disease, he advises that a physician or surgeon be consulted. If he decides the defect is not the effect of disease and that it can be corrected by the use of lenses, he determines the character of lenses requird, and for these services he charges a fee. It is appellant's position that in Texas there is no

law requiring that he possess any given degree of skill or learning upon the subject of the eye as a prerequisite to his charging a fee for the services mentioned. His position is sound unless his avocation is within the purview of the Medical Practice Act. If an oculist had made the examination and determined that the defect was one, the correction of which could be had by the use of drugs and had advised their use and charged therefor, the fact that his act would constitute the practice of medicine, within the meaning of the Code, cannot be the subject of controversy. The legal distinction between the oculist and the optometrist, if one exists, would seem, according to appellant's theory, to depend upon the means or agencies used in aiding defective vision.

Did the Legislature, in writing the statute, intend that it should bear this construction? Was it contemplated that one who detected defects of vision and relieved them by agencies other than lenses should be required to possess the knowledge requisite in a medical practitioner, and that one who examined the eyes and recommended lenses as a means of aiding the defects of vision should not be required to possess any knowledge of anatomy, of the eye, of the human system, or of the disease that might affect the vision? The statute under consideration is the result of the Legislature's effort, in the exercise of the police power, to preserve and protect the public health. There is implied an intent to take note of the organs of the body. The eye is the organ of vision. In the eye there are many parts, each performing a distinct function, but all designed by nature to produce the sense of sight. It is interrelated with other organs of the body. The New International Encyclopædia, Vol. 11, page 396.

"The eyeball is connected with the brain by a slender cord of nerve filaments, the optic nerve, destruction of which causes blindness. This nerve passes through a small opening in the apex of the orbit and thus reaches the interior of the skull; after passing along the base of the brain a short distance, the optic nerves of the two unite, a part of the fibres decussation and passing to the opposite side, a portion continuing upon the same side as the eye from which they arise. Penetrating the substance of the brain, the fibres of the optic nerve finally terminate in nerve cells of the gray covering at a region situated in the median and posterior aspect of the brain, known as the visual cortical area." (The New International Encyclopædia, Vol. 20, page 175.)

"The diseases of the eye enumerated by the surgeon are very numerous, owing to the variety of the tissues and parts of which the eye is formed. Nearly all its parts are liable to inflammation and its consequences." (The New International Encyclopædia, Vol. 11, page 399.)

It seems obvious that defects of vision may result from disease

of the eye and other organs of the body. It is conceded that the optometrist must discern that the impairment which he seeks to remedy by lenses is not consequent upon disease. It follows that while the eye operates upon mechanical principles, it cannot be treated as a mechanism alone. It vitality as an element of the human body cannot be overlooked. Other organs of the body function upon mechanical principles; for example, the heart as a pump, the muscles as levers, but they, like the eye, are nevertheless organs of the human body, and each organ is, to a degree, interrelated with all the other.

It was appellant's business to detect and characterize disorders by means of scientific devices and to correct defects of vision by means of lenses. Upon this subject the State, through its counsels, in their brief, makes these observations:

"The optometrist who prescribes eye-glasses to remedy defects in the human eyes must first discover these defects and analyze their true character. It is also true that, after he discovers the disorder or defect, he is practicing medicine if he undertakes to correct it by any system or method, and charges therefor, even though the method employed be purely mechanical.

But the optometrists contend that they examine the eye only to discover those defective conditions which may be corrected by the aid of lenses, and in the information in the instant case it is charged that the defendant examined the eyes of H. P. Davis 'to determine proper glasses for the optical requirements of the eyes of said H. P. Davis.' This implies that there was something wrong with the vision of Davis and it was necessary to examine his eyes to determine the character of the defect and to determine proper glasses to correct the same. In doing this, however, the optometrist must differentiate between those conditions which are caused by disease, and are not merely the so-called errors of refraction and which can only be remedied by some remedial agent other than lenses, and those conditions or defects which, in the judgment of the optometrist, can be remedied or corrected by lenses. He must differentiate between those errors of vision caused by disease and those errors of vision which are the so-called errors of refraction, and not necessarily due to disease. The patient must rely solely upon the conclusion of the optometrist with respect to this important matter. This is the essential preliminary step. The character of the defective condition must first be determined, because, according to the contention of the optometrist, they will not undertake to correct those defects which are caused by disease, and, therefor, they must first determine in every case whether the given defect is or is not caused by disease and the patient must, of course, abide the consequences of their uninformed decision, however disastrous such consequences may prove to be. Again, how can a man who knows nothing of anatomy, pathology,

histology, and other elementary subjects mentioned in the Medical Practice Act, examine as delicate and complicated an organ as the eye and determine whether the defect of vision is or is not a resultant symptom of some disease or disorder of the body, rather than a mere optical error? How can such a person exclude, by diagnosis, diseases and other like causes of defective vision, when he admits that he has no information with respect to such diseases? It is indeed a novel proposition to affirm that one is qualified to diagnose diseases for the purpose of excluding cases of disease from the scope of his treatment, who has received no training with respect to the nature and cause of disease.''

Recalling the solicitude which the law-making department of the government of this State has displayed for the protection of the public health; the breadth of the language chosen in which to define the practice of medicine and its failure to exempt the optometrist therefrom, bearing in mind the often-repeated declaration of this court in construing the Medical Practice Act, that it dealt not with the remedial agent employed but embraced those treating any disorder or physical deformity for pay, we cannot persuade ourselves that those practicing optometry, as described by the evidence, are not embraced within the terms of the Medical Practice Act. The opposite interpretation of the statute would affirm that the Legislature left unprotected so important, so delicate, so complicated a part of the body as the organ of vision against the ills that might befall from the absence of restriction upon those who hold themselves out to the public as possessing the requisite knowledge and skill to determine and classify the ailments and consequent defects for a fee, and advise the corrective agencies which he determines are indicated.

The Legislature of this State, cognizant of the fact that in most of the other states of the Union, laws have been enacted with special reference to the protection of the vision against the consequences of ignorance upon the part of those who assume to detect the causes of impairment and correct errors of vision, has failed, as is done elsewhere, to separate those who thus practice into a distinct class and prescribe the qualifications which shall entitle them to practice. We must therefore assume that in requiring an examination and certificate from all who shall "treat any disorder or physical deformity by any system or method and charge therefor" it was not intended to exclude those who deal with the organ of vision as did the appellant. The power of the Legislature to put the optometrists in a separate class, as it has done dentists and nurses, is without question. The expediency of doing so is a matter of policy with which the courts are not concerned. Until it is done or the optometrist, as defined in the evidence herein, is expressly exempted from the operation of the Medical Practice Act, he, in our judgment, is required

thereby to obtain from the State a license showing that he possesses the knowledge requisite to the pursuit of the practice of medicine.

The judgment is affirmed.

*Affirmed.*

ON REHEARING.

. February 22, 1922. ·

HAWKINS, JUDGE.—Our statute declares that: "The repeal of a law, where the repealing statute substitutes no other penalty, will exempt from punishment all persons who may have offended against the provisions of such repealing (repealed) law, unless it be otherwise declared in the repealing statute." (Penal Code, Art. 16.)

This statute has the effect of terminating the prosecution at any stage before final judgment. Vernon's Texas Crim. Statutes, Vol. 1, p. 11. This statute and rule are invoked by the appellant in the instant case upon the ground that they are brought into operation by the enactment of Chapter 51 of the Acts of the Thirty-seventh Legislature, 2d Called Session (p. 159), in which chapter the practice of optometry is defined and regulated. The definition, (Sec. 1), is in this language: "The practice of optometry is hereby defined to be the employment of objective or subjective means, without the use of drugs, for the purpose of ascertaining and measuring the powers of vision of the human eye, and fitting lenses or prisms to correct or remedy any defect or abnormal condition of vision. Provided that nothing herein shall be construed to permit optometrists to treat the eyes for any defect whatsoever in any manner nor to administer any drug or drugs externally or internally, nor to prescribe drug or drugs or physical treatment whatsoever, unless such optometrist is a regular licensed physician or surgeon under the laws of this State."

Section 15 reads thus: "Any one practicing optometry in this State, who shall prescribe or fit lenses for any diseased condition of the eye or for any disease of any other organ of the body that manifests itself in the eye, shall be deemed to be practicing medicine within the meaning of the statutes of this State defining the practice of medicine and prohibiting the practice thereof without a license, and any such person possessing no license to practice medicine shall be liable to prosecution for the unlawful practice of medicine without a license and, upon conviction thereof, shall be subject to the same penalties or punishment as is prescribed by law for the practice of medicine without a license."

And Section 17 reads thus: "Nothing in this Act shall be construed as giving authority to use, prescribe, sell or offer for sale any lotions, salves, or medicines of any kind or description, practice medicine and surgery within the provisions of Chapter XCIII, Acts of the Thirtieth Texas Legislature, or as conferring any title or ap-

pellation in a sense to indicate the practice of medicine and providing that the title of Optometrist or practice, as defined in Section 1 of this Act, shall not be construed as practicing medicine or surgery or indicating the practice of medicine or surgery.''

The chapter of the Acts of the Thirtieth Legislature referred to is identical with Chapter 6, Title 12 of the Penal Code relating to the unlawful practice of medicine.

Section 18, reads: ''All laws and parts of. laws in conflict with the provisions of this Act be and the same are hereby repealed.''

By reference to our original opinion will be found the charge upon which appellant was prosecuted. The evidence discloses that no drugs were used by him in the examination of the eyes, and no treatment involving the use of drugs was prescribed.

Under the broad provisions of the Medical Practice Act we construed what he did, however, to come thereunder. Pending this appeal the Thirty-seventh Legislature has passed the optometry statute, some of the provisions of which are quoted above. The Medical Practice Act is not repealed thereby. On the contrary, it is referred to in the optometry statute, and provides that certain things shall be regarded as practicing medicine. But by the plain provisions of the Acts of the Thirty-seventh Legislature the particular acts done by appellant, and which were held by us to have been ''practicing medicine,'' were included in the definition of ''optometry;'' and the last clause of Sec. 17, supra, reads: ''And providing that the title of Optometrist or practice. as defined in Section 1 of this Act, shall not be construed as practicing medicine or surgery, or indicating the practice of medicine or surgery.''

The purpose and effect of Article 16, P. C. is to relieve an accused from suffering the penalty for an Act denounced by our law as criminal when the charge is made and the trial had, but which before final judgment is no longer an offense. (See cases collated under said Article in Vernon's P. C.)

The acts for which appellant was convicted being no longer an offense against the Medical Practice Act by the express terms of the Optometry Act of the Thirty-seventh Legislature, we are necessarily constrained to hold that the provisions of Article 16 of the Penal Code inures to his benefit.

For the reasons stated, the motion for rehearing is granted; the judgment of conviction is set aside, and the prosecution ordered dismissed.

*Dismissed.*

April 26, 1922.

LATTIMORE, JUDGE.—The original judgment of the court below was affirmed by this court. Subsequently the Legislature passed an Optometry bill. Believing that the matters and things charged against appellant, the doing of which had made him liable to prosecution under the medical practice act of this State, were comprehended by the terms of the Optometry bill, and that in effect one who had done and performed the acts charged against appellant was exempted from prosecution by the passage of said Optometry bill, we granted appellant's motion for rehearing and reversed and dismissed this case. The State has now made a motion for a rehearing herein, based on the following propositions:

1. That the judgment of this court in its original opinion affirmed that the acts of appellant charged and proven herein brought him within the prohibition of our State medical practice act.

2. That our opinion on rehearing amounts to an assertion that one acting under the provisions of the Optometry bill recently passed, is not controlled or governed by the provisions of the medical practice act.

3. That this practically amounts to a violation of Section 31, Art. 16, of our State Constitution forbidding preference by law to any school of medicine.

We are unable to agree with the State's contention. As we understand the Optometry bill passed by the recent Called Session of the Thirty-seventh Legislature, no preference is therein given to any school of medicine, but this question is not now before us. While the Constitution forbids any legislation showing preference for any school of medicine, it does not forbid legislative definition of what does and also of what does not constitute the practice of medicine. The medical practice act of this State has been upheld by this court and the Supreme Court of the United States as being constitutional and as not discriminating among or showing preference for any school of medicine.

We think the Legislature has power to prescribe the duties of nurses, of opticians and of optometrists, and also to define those things which shall constitute the practice of medicine in this State. Having such power, we also think the Legislature may make as a part of its definition of the practice of optometry, or the duties of opticians, a distinction between the powers and duties of same, and those which are to be considered as the practice of medicine; and this is as far as the Legislature has gone in said optometry bill in our judgment.

Believing that there is nothing in the opinion of this court on rehearing which results in discrimination between or preference for any school of medicine, and that the judgment for rehearing granted to appellant was in conformity to law, the State's motion for rehearing will be overruled.

*Overruled.*