# OCTOBER 11, 1944

## EX PARTE W. B. HALSTED.

No. 22775. Delivered June 7, 1944.
Rehearing Denied October 11, 1944.

454

The opinion states the case.

*Rogers, Spurlock & Love,* of Fort Worth, for appellant.

*Ernest S. Goens,* State's Attorney, of Austin, for the State.

*E. B. Simmons,* of San Antonio, General Defense Counsel, Texas State Chiropractic Ass'n., Inc., filed brief as amicus curiae.

*E. T. Branch,* of Houston, for Harris County Chiropractors, filed brief as amicus curiae.

*Leonard Brown,* of San Antonio, for Bexar County Chiropractors, filed brief as amicus curiae.

*Louis Wilson,* of Dallas, for Dallas County Chiropractors, filed brief as amicus curiae.

*Kuykendall, Bauknight, Mann & Stevenson,* of Austin, also filed briefs as amicus curiae.

DAVIDSON, Judge.

By Chapter 359, Acts 1943, Regular Session, 48th Legislature, appearing as Arts. 4512a—1 to 4512a—18, Vernon's Annotated Revised Civil Statutes, known as the "Chiropractic Act," and hereinafter referred to as the "Act," the legislature set up, recognized, and defined, as an independent field of endeavor, the Science of Chiropractic, and prescribed rules and regulations governing the practice thereof, in this State. Among the offenses created in the Act, it is unlawful for anyone: (1) to practice chiropractic without a license; (b) to advertise as a chiropractor without following his name with the term "chiropractor"; and (c) for one practicing chiropractic to advise a parent against having his child treated by vaccination. The first two named offenses are misdemeanors; the other is a felony.

Relator stands charged, in the County Court of Johnson County, with having committed the misdemeanors, and, before the Justice Court of Precinct No. 1 of said County, as an examining court, with having committed the felony. He was arrested upon said accusations and taken into custody. By writ of habeas corpus before the District Court of said County, he sought his discharge from such arrest and custody, asserting that the Act mentioned was unconstitutional and void, and that the offenses charged against him were not based upon any valid law. After hearing, the relief prayed for was denied, and he was remanded to the custody of the arresting officer. From this order, he appeals to this court.

We are confronted, first, with the contention of the State, as respondent, that this court is without jurisdiction of this appeal, it being insisted all matters relied upon by the relator may be properly and fully raised upon the trial of the cases pending against him, and that, in the event of conviction he would be fully protected by an appeal to this court.

Ordinarily, respondent's contention is correct; but, there are exceptions to the rule, among which is that, where one claims that the statute which he is charged with having violated is void and unconstitutional, the writ of habeas corpus may be resorted to in order to test the validity of the statue. Branch's P. C., Sec. 258; Ex parte Patterson, 58 S. W. 1011, 42 Tex. Cr. R. 256, 51 L. R. A. 654; Ex parte Luna, 266 S. W. 415, 98 Tex. Cr. R. 458; Ex parte Oates, 238 S. W. 930, 91 Tex. Cr. R. 79; Ex parte Spelce, 119 S. W. (2d) 1037, 135 Tex. Cr. 367; Ex parte Carter, 156 S. W. (2d) 986, 143 Tex. Cr. R. 46. It follows, therefore, that this court has jurisdiction of this appeal.

Relator contends that the Act is void and unconstitutional, and is violative of provisions of both State and Federal Constitutions, in that it is class legislation; that it violates the non-preference clause of Art. 16, Sec. 31, of our State Constitution; and that the definition given the term "chiropractic," and the practice thereof, is so vague, indefinite and uncertain as to be incapable of being understood or enforced.

Respondent contends that chiropractic and the practice thereof, as defined and set up in the Act, is a public health measure, and, therefore, a subject coming within the police power of this State; that, under such power, the legislature was authorized to give special treatment to, and to set up and establish, chiropractic and the practice thereof as an independent field of endeavor; and that the Act as a whole, and when viewed in that light, is valid. Upon these issues a construction of the Act is called for by this court.

In approaching a determination of the question thus presented, it is well that certain established rules of statutory construction be kept in mind.

Under our system of government, the legislature has the power to pass any and all laws which to it may seem proper, so long as same violate no provisions of our State or Federal Constitutions. A law must be sufficiently definite that its terms and provisions may be known, understood, and applied. An Act of the legislature which violates either of said Constitutions, or an Act that is so vague, indefinite, and uncertain as to be incapable of being understood, is void and unenforceable. A void law affords no basis for a criminal prosecution.

The power to determine the validity of an Act of the legislature rests with the courts. In the exercise of this power by the

courts, certain rules of construction have been recognized and adopted, chief among which are: It is the duty of the courts to ascertain the intent of the legislature, and, where possible, to enforce it by giving effect thereto (39 Tex. Jur. 166; 50 Am. Jur. [Statutes], Sec. 223) ; if the legislative enactment be susceptible of two constructions, to apply that which sustains rather than defeats it; to strike down no legislative enactment unless and until its invalidity definitely appears. In the exercise of this power and in determining the validity of any law, the courts are powerless to add anything thereto or to-rewrite or change the same. The courts must not, under the guise of construction, enter the field of legislation. 39 Tex. Jur. 162; 50 Am. Jur. (Statutes), Sec. 228.

Art. 16, Sec. 31, of our State Constitution reads as follows:

"The Legislature may pass laws prescribing the qualifications of practitioners of medicine in this State, and to punish persons for mal-practice, but no preference shall ever be given by law to any schools of medicine."

By authority of this constitutional provision, as well as by the general police power to protect the public health, the legislature has, by law, specially defined the practice of medicine, and has prescribed rules and regulations governing the practice thereof, under what is known as the "Medical Practice Act," and which appears as Chapter 6, Title 12, of the Penal Code, and Chapter 6, Title 71, Revised Civil Statutes, passed in 1907.

The term "practicing medicine" is, in the Medical Practice Act, defined as follows (Art. 741, P. C., and Art. 4510, R. C. S.) :

"Any person shall be regarded as practicing medicine within the meaning of this chapter:

"1. Who shall publicly profess to be a physician or surgeon and shall treat or offer to treat any disease or disorder, mental or physical, or any physical deformity or injury, by any system or method, or to effect cures thereof.

"2. Who shall treat or offer to treat any disease or disorder, mental or physical, or any physical deformity or injury, by any system or method, or to effect cures thereof and charge therefor, directly or indirectly, money or other compensation."

The Medical Practice Act, as well as the definition of "practicing medicine," has been sustained as valid—not only by this court, but also by the Supreme Court of the United States. Ex

parte Collins, 57 Tex. Cr. R. 2, 121 S. W. 501; Collins v. State, 223 U. S. 288, 56 L. Ed. 439, 32 Sup. Ct. 286; Larson v. State, 106 Tex. Cr. R. 261, 285 S. W. 317 (writ of error dismissed, 47 Sup. Ct., 332, 273 U. S. 776, 71 L. Ed. 886) ; Allison v. State, 127 Tex. Cr. R. 322, 76 S. W. (2d) 527 (appeal dismissed, 55 Sup. Cr. 828, 295 U. S. 717, 79 L. Ed. 1672). Said definition has not been changed or modified. The Act before us makes no attempt to do so.

In construing the Medical Practice Act, and in determining what constitutes the practice of medicine thereunder, it has been the long and consistent holding of this court that one who publicly professes to treat diseases or disorders, and to effect cures thereof, or one who in fact treats diseases or disorders, as a profession or avocation, is practicing medicine, regardless of the system or method employed, the name by which the system is known, or whether or not drugs or surgery are used. The practice of medicine, as contemplated and defined by law, is not restricted to the treatment of diseases and disorders of the human body by the use of drugs or surgery.

Such is the effect of the holding in cases where those practicing chiropractic, as known and generally understood, were convicted of practicing medicine, as shown by: Teem v. State, 79 Texas Crim. Rep. 285; 183 S. W. 1144; Maier v. State, 90 Tex. Cr. R. 459, 235 S. W. 576; Guy v. State, 116 Tex. Cr. R. 392, 32 S. W. (2d) 460; Lemly v. State, 107 Tex. Cr. R. 67, 294 S. W. 856; Robertus v. State, 119 Tex. Cr. R. 370, 45 S. W. (2d) 595; Allison v. State, supra; Piner v. State, 131 Tex. Cr. R. 266, 97 S. W. (2d) 953. Such was also true of masseurs (Dankworth v. State, 67 Tex. Cr. Rep. 157, 136 S. W. 788; Milling v. State, 67 Texas Crim. Rep. 551, 150 S. W. 434; Hyroop v. State, 79 Tex. Cr. 150, 179 S. W. 878) also, of osteopaths (Ex parte Collins, supra) ; and, of optometrists, prior to the passage of the Optometry Act (Baker v. State, 91 Tex. Cr. 521, 240 S. W. 924, 22 A. L. R. 1163).

This judicial history becomes an important factor in construing the Act before us. The legislature had notice thereof. So, when the Act as a whole is viewed in the light of the holdings of this court, the conclusion is apparent that, by the passage of this Act, the legislature intended: to take chiropractic and the practice thereof out of the field of the practice of medicine as defined in the Medical Practice Act; to set it up as an independent science, separate and distinct from the practice of medicine; and, by special treatment and classification, to authorize chiropractors, by chiropractic, to treat diseases and dis-

orders of the human body. Such an interpretation of the intent of the legislature is fortified, in the first instance, by reason of the fact that, unless chiropractic and the practice thereof be a subject relating to the public health, the legislature would have no authority to regulate the business, or profession, or avocation, of practicing that science (Baker v. State, supra; People v. Griffith, 280 Ill. 18, 117 N. E. 195) ; and, secondly, by the language contained in the emergency clause (Sec. 17), viz., "The increasing demand for the use of Chiropractic by the citizens of the State of Texas for regaining and maintaining of public health, and the fact that a more adequate protection of the public health from unqualified practitioners is urgently needed. - - - - - - - - -."

So then, the question before us is: Does the Act express the legislative intent, in a valid, definite, understandable law? If so, did the legislature have the authority to enact such a law?

As to the first question, the definition the legislature gave to the term "chiropractic," and the practice thereof, is of paramount importance. It is defined in Sections 3 and 3a of the Act, which read as follows:

"Sec. 3. Chiropractic is defined to be the Science of analyzing and adjusting the articulations of the human spinal column, and its connecting tissues, without the use of drugs or surgery. Chiropractic shall in no sense be construed or defined as treatment or attempted treatment of patients by use of surgery or medicine. It is hereby declared the purpose of the Legislature to make as definite the distinction between Chiropractic and other sciences as the distinction between Dentistry and Medicine.

"Sec. 3a. No chiropractor shall treat any patient for any ailment or illness except by chiropractic as that term is herein defined. Provided that it shall be a violation of this Act for any person licensed hereunder to treat any person for infectious or contagious diseases or to engage in the practice of medicine."

Section 3 is divided into two parts: One, positive; the other, negative; that is to say, one sets forth what chiropractic is, while the other sets forth what it is not. These, taken together, constitute the definition of chiropractic as contained in that Section. By the positive, chiropractic is the "Science of analyzing and adjusting the articulations of the human spinal column, and its connecting tissues, without the use of drugs or surgery." Just how the analysis and adjustment is made or accomplished

the Act does not purport to say, further than that neither drugs nor surgery may be used. Under the negative, "Chiropractic shall in no sense be construed or defined as treatment or attempted treatment of patients by use of surgery or medicine." It is not the practice of medicine, but is separate and distinct therefrom. The terms "surgery" and "medicine," not being specially defined, are used in the sense in which they are commonly understood.

So, then, under Section 3, it may reasonably be said that chiropractic is the science of analyzing and adjusting the articulations of the human spinal column, and its connecting tissues, without the use of drugs or surgery, and that it is not the practice of medicine as defined in the Medical Practice Act, but is separate and distinct therefrom.

Section 3a of the Act has reference, primarily, to chiropractors—those licensed and authorized to practice chiropractic. The rights, powers, and privileges conferred upon chiropractors, of necessity, have a bearing upon, and become a part of, the definition of chiropractic, for, whatever a chiropractor may lawfully do as a practitioner of that science becomes a part of the definition thereof.

The first part of Section 3a reads as follows:

"No chiropractor shall treat any patient for any ailment or illness except by chiropractic as that term is herein defined."

What is the meaning of this language? The answer calls for an application here of the well-recognized rule of statutory construction, viz., that the express mention of one thing is tantamount to an exclusion of all others, and affirmative words imply a negative of what is not affirmed, and negative words imply an affirmative of what is not negatived. 39 Tex. Jur. (Statutes), Secs. 100, 189; 50 Am. Jur. (Statutes), Sec. 429.

Under such rule, then, the quoted language, of necessity, means, and is construed to mean, that a chiropractor may treat a patient for an illness or disease, by chiropractic. Such construction is also required by the other provisions of Sec. 3a; that is to say, "Provided that it shall be a violation of this Act for any person licensed hereunder to treat any person for infectious or contagious diseases or to engage in the practice of medicine."

If the legislature intended that chiropractic be not the treatment of illness or disease, and that a chiropractor, by chiroprac-

tic, could not treat, and was precluded from treating, patients for all ailments or illnesses, no reason existed for the use of the language quoted, because the treatment of any and all diseases would have included infectious and contagious diseases. The fact that the treatment of infectious and contagious diseases, alone, constitutes a violation of the law shows that the legislature intended to permit a chiropractor, by chiropractic, to treat patients for all other ailments and diseases.

But, the legislature did not stop with prohibiting the treatment of infectious and contagious diseases. It went further and, in the same Section, made it a violation of the Act for a chiropractor "to engage in the practice of medicine," which, as we have shown, means, of necessity, that a chiropractor, by chiropractic, was prohibited from treating or offering to treat diseases or disorders of the human body, for compensation.

Section 3a, therefore, by its terms, authorizes a chiropractor to treat patients for all ailments and diseases except those that are infectious and contagious, and, at the same time, makes it unlawful for him to do so.

As thus construed, Section 3 and 3a are in irreconcilable conflict, for, by the terms thereof, a chiropractor is both permitted to treat, and is prohibited from treating, patients for illnesses and diseases. He is both within and without the provisions of the Medical Practice Act defining the practice of medicine. Such being true, it is impossible, from the wording of the Act, to determine what is chiropractic and the practice thereof, or whether same is or is not the practice of medicine, under the Medical Practice Act, as judicially determined.

As demonstrative of this conclusion, suppose a chiropractor licensed under this Act treats a patient, for pay, by chiropractic, for an illness that is neither infectious nor contagious. One Section of the Act expressly authorizes him to do so, while another says that, if he does do so, he is guilty of violating the law, in that such treatment on his part would constitute the practice of medicine.

Respondent recognizes this apparent conflict between Sections 3 and 3a, but insists: That such construction is too restrictive, and that, regardless of the wording of the two Sections, the intent of the legislature to set chiropractic aside as an independent field of endeavor—separate and distinct from the practice of medicine—is evident; that the provisions of the Act

leading to a contrary conclusion should and can be rejected; that what the legislature intended, in prohibiting a chiropractor from practicing medicine, was that he could not practice medicine by means or methods outside of and other than chiropractic; and that, so long as he treats patients by chiropractic, he is not practicing medicine.

If respondent's view be accepted, then the validity of the Act depends upon the power of the legislature to say that one who treats a patient for non-contagious or non-infectious diseases or disorders, by analyzing and adjusting the articulations of the human spinal column and its connecting tissues, and without the use of drugs or surgery, is not practicing medicine within the meaning of the Medical Practice Act. In other words: Does the legislature have the power and authority to pass such a law, and thereby to create and to set aside, as an independent class, profession, and avocation, treatment of diseases and disorders of the human body by the science of Chiropractic?

There is no question but that, under its police power, the legislature is authorized to regulate and to control the treatment of diseases and disorders of the human body. It is also true that the legislature may make reasonable classifications of practitioners in that field, and that such classifications are not inhibited by the provisions of the 14th Amendment to the Federal Constitution relative to class legislation. Dent v. West Virginia, 129 U. S. 114, 32 L. Ed. 623, 9 Sup. Ct. 231; Watson v. Maryland, 218 U. S. 173, 54 L. Ed. 987, 30 Sup. Ct. 644; McNaughton v. Johnson, 242 U. S. 344, 37 Sup. Ct. 178, 61 L. Ed. 352; Baker v. State, supra; Dowdell v. McBride, 92 Tex. Cr. R. 239, 47 S. W. 524; Pistole v. State, 68 Tex. Cr. 127, 150 S. W. 618; Ex parte Collins, supra; Sherman v. State Board of Dental Examiners, 116 S. W. (2d) 843. Such was recognized as authorizing the legislature of this State to pass the Optometry Act (Chapter V, Title 12, P. C.) and the Dental Act ( Chapter VII, Title 12, P. C.). Such also appears as the doctrine upon which the validity of Acts of other States of the Union controlling and regulating the practice of chiropractic has been upheld and sustained. In this State, however, the authority of the legislature to enact legislation touching the practice of medicine, or the healing art, has been expressly limited by the Constitution, in Art. 16, Sec. 31 thereof, heretofore mentioned. No similar constitutional provisions, in any of the States, where the validity of legislation authorizing the practice of chiropractic has been sustained have been called to our attention. Hence, the fact that other States of the Union have authorized the practice of

chiropractic as an independent field of endeavor, and as being outside the field of the practice of medicine, is of little consequence here. This Act must be construed in the light of our own Constitution.

As sustaining the validity of the Act and the power of the legislature to enact the same, reliance is had upon the Optometry and Dental Acts, supra, the validity of which has been sustained by the courts.

It is apparent that, in the passage of this Act, the legislature had these Acts in mind. We analyze said Acts and the basis upon which their validity was sustained.

"Optometry" is defined by Art. 735, P. C., and Art. 4552, R. C. S., as follows:

"- - - - - the employment of objective or subjective means without the use of drugs, for the purpose of ascertaining and measuring the powers of vision of the human eye, and fitting lenses or prisms to correct or remedy any defect or abnormal condition of vision."

Said Article further provides:

"Nothing herein shall be construed to permit optometrists to treat the eyes for any defect whatsoever in any manner nor to administer nor to prescribe any drug or physical treatment whatsoever, unless such optometrist is a regularly licensed physician or surgeon under the laws of this State."

In Baker v. State, supra, the accused was convicted of practicing medicine without a license, because it was his "business to detect and characterize disorders by means of scientific devices and to correct defects of vision by means of lenses." In other words, he was an optometrist. This court held that such was practicing medicine, and affirmed the conviction. A motion for rehearing was filed, and, while that motion was pending, the legislature passed the Optometry Act. This court, then, in passing upon the motion for rehearing, determined that the Optometry Act was valid, and that, by the repealing clause thereof, the acts upon which the conviction had been obtained no longer constituted the practice of medicine as defined in the Medical Practice Act, and reversed the judgment of conviction and ordered the prosecution dismissed. Following this holding, the State filed a motion for rehearing, asserting, among other things, the invalidity of the Optometry Act, because it violated Sec. 31 of

Art. 16 of our State Constitution, which forbids preference by law to any schools of medicine. In overruling the State's contention, we held that it was within the power of the legislature to make a distinction between optometry and the practice of medicine and that the Optometry Act did not constitute a preference.

The Baker case, supra, has an important bearing upon the determination of the question before us, because it is authority, by the original opinion, for holding that the practice of chiropractic as defined in the Act constitutes the practice of medicine under the Medical Practice Act. On the other hand, if chiropractic comes within the same legal category as optometry, it is authority for the contention that the legislature was authorized to distinguish it from the practice of medicine.

There is, however, a very material difference between the two, which lies in the fact that the optometrist is limited, in his practice, to the eye and to correcting defective vision. He is expressly precluded from treating the eye for disease or disorder. He is precluded from practicing medicine, that is, from treating for diseases or disorders of the human body. Such is not true of the chiropractor. He is not limited to treating a particular organ of the body, but, to the contrary, may treat the whole of the body, because we know that the spinal column and its connecting tissues embraces the entire body and all organs thereof. Thus the distinction between optometry and chiropractic is apparent. One relates to a particular organ of the body, without treating that organ for disease or disorder. Chiropractic relates to the whole of the body, and authorizes the treatment thereof for diseases or disorders.

We are constrained, therefore, to hold that the Baker case, supra, furnishes no precedent supporting the validity of the Act before us, or that chiropractic is not preferred under the constitutional inhibition mentioned.

As to the Dental Act, we note that "dentistry" is defined in Art. 754a, P. C., as follows:

"Any person shall be regarded as practicing dentistry within the meaning of this Chapter:

"(1) Who publicly professes to be a dentist or dental surgeon or who uses or permits to be used for himself or for any other person, the title of 'Doctor,' 'Dr.' 'Doctor of Dental Surgery', 'D.D.S.', 'Doctor of Dental Medicine', 'D. M. D.', or any other let-

ters, titles, terms or descriptive matter which directly or indirectly represents him as being able to diagnose, treat, remove stains or concretions from teeth, operate or prescribe for any disease, pain, injury, deficiency, deformity or physical condition of the human teeth, alveolar process, gums or jaws.

"(2) Who shall offer or undertake, by any means or methods whatsoever to diagnose, treat, remove stains or concretions from teeth, or shall treat, operate or prescribe, by any means or methods, for any disease, pain, injury, deficiency, deformity or physical condition of the human teeth, alveolar process, gums or jaws, and charge therefor, directly or indirectly, money or other compensation."

Thus, in his particular field of endeavor, the dentist is restricted to a certain part of the human body. He is not authorized to treat the body generally for disease or disorder.

The Dental Act bears the same distinguishing features as does the Optometry Act.

We come now to a determination of whether the Act before us is violative of the non-preference clause of Art. 16, Sec. 31, of our State Constitution. Said Section is a part of the Constitution of 1876, and has remained unchanged through the years. It is and has been the basis upon which has rested the legislative control over, and definition of, the practice of medicine. It furnishes the direct reason why the courts have steadfastly held that, if one treats or offers to treat, as a business, profession, or avocation, diseases or disorders of the human body—by any method, system, or means—he must first qualify himself to do so by taking the same examination that is required of all others doing the same thing, regardless of the system employed. Not only was such interpretation authorized, but same was required by that provision of said Art. 16, Sec. 31, which says that "No preference shall ever be given by law to any schools of medicine." The term "schools of medicine," as there used, means, and has reference to, the system, means, or method employed, or the schools of thought accepted, by the practitioner. Such is exemplified by Chapter 12, Act 27th Legislature, 1901. wherein the legislature created three separate Boards of Medical Examiners in this State, each representing a particular system, method, or school of thought, for the treatment of disease, that is, a Board of Examiners for the allopaths, one for the homeopaths, and one for the electics. However, the subjects embraced in the examination required for license under either Board were the same, such requirement being necessary in order that there

be no preference between the three different schools of thought. The Act of 1901 was superceded by our present Medical Practice Act. passed in 1907, c. 123.

Under the Medical Practice Act, one desiring to practice medicine must possess certain qualifications as to character and educational attainments (Art. 4501, R. C. S.) and must pass a satisfactory examination upon certain basic subjects (Art. 4503, R. C. S.).

Under the Act before us, one desiring to practice chiropractic must also possess certain qualifications of character and educational attainments, and must pass a satisfactory examination upon certain basic and special subjects (Sec. 7 of the Act).

The educational qualifications for each are materially different. Those under the Medical Practice Act are decidedly more onerous. There is a direct difference between the subjects upon which the applicants must be examined. In fact, only four subjects are embraced in each examination. As to which is the more onerous, it is not for us to say. The fact remains that there is a material difference in the subjects embraced in the respective examinations. Assuming, then, that, under the Act before us, the legislature has set up, recognized, and defined chiropractic as a system, means, and method for the treatment of diseases and disorders of the human body, and that practitioners thereof are authorized to treat, by chiropractic, patients for diseases and disorders, it is evident that the legislature has preferred such science and such practitioners over all others engaged in doing the same thing, that is, in treating the human body for diseases and disorders, because the chiropractor is not required to have the same educational qualifications, nor is he required, as a condition precedent to his right to so treat patients, to pass a satisfactory examination upon the same subjects that are required of all others similarly situated.

. Thus a preference has been, by the legislature, accorded and extended the chiropractic system of the healing art, in violation of Art. 16, Sec. 31, of our State Constitution. But, the preference accorded the chiropractic system does not stop there. The Act goes further; for we know that, prior to, and at the time of, the passage of this Act, one who had qualified, under the Medical Practice Act, to treat and to offer to treat diseases and disorders, as a profession, business or avocation, was at perfect liberty to do so by the chiropractic system of the healing art, or by any other system, means or method that to him

seemed proper. The law did not control, nor did it attempt to control, the licensed practitioner under the Medical Practice Act, in the system, means, or method he employed. All that the law required was that if one treated or offered to treat diseases or disorders, as a calling, he must first qualify himself to do so by satisfactorily passing the examination required of all others similarly situated and coming within the same class. Such, however, is no longer true under the Act before us, because, even though one be licensed to practice medicine under the Medical Practice Act, he cannot employ the chiropractic system of treating diseases and disorders, without taking and satisfactorily passing the examination required under this Act. For one to practice chiropractic he must qualify so to do under the Act. There are no exceptions.

Thus the legislature has carved out of the field of the healing art a single system for treating diseases and disorders, and has given it special treatment, limiting the use thereof to those only who qualify under the terms of this Act. That such legislation violates the non-preference clause of Art. 16, Sec. 31, of our State Constitution definitely appears.

The legislature found, as a predicate for the passage of this Act, that there was an increasing demand by the citizens of this State for the use of chiropractic in regaining and maintaining health, and that the public health required a more adequate protection against unqualified practitioners thereof.

As laudable and praiseworthy as was the legislative purpose, yet such facts furnish no reason or basis to violate the Constitution of this State to attain that objective. When the Constitution speaks, it is supreme. An enduring and lasting government requires that it so remain.

When this Act is thus construed as an overall picture, chiropractic and the practice thereof is either definite or indefinite, certain or uncertain. If indefinite or uncertain, it falls by reason thereof. If it be definite and certain, it violates the non-preference clause of Art. 16, Sec. 31, of the Constitution of this State.

It follows, from what has been said, that we hold the Act unconstitutional and void. There exists, therefore, no valid law denouncing as a crime the acts charged against relator, and he is entitled to be discharged.

The judgment of the trial court is reversed and the relator is ordered discharged.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

## ON MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

After this case was originally submitted the court realized the seriousness of the questions presented and ordered a re-submission and requested argument and briefs upon the pivotal issue. The argument and briefs were given careful consideration and the conclusions reached as reflected in the original opinion released on June 7, 1944.

The motion for rehearing has had our most earnest attention and the conclusions announced originally remain unchanged.

No good purpose would be served by writing further.

The motion for rehearing is overruled.