**Michael D. MACMILLAN,
et al., Appellants,**

**v.**

**REDMAN HOMES, INC.,
et al., Appellees.**

No. 04–90–00429–CV.

Court of Appeals of Texas,
San Antonio.

Sept. 11, 1991.

Rehearing Denied Oct. 8, 1991.

Darby Riley, San Antonio, for appellants.

Clayton E. Devin, McCauley, MacDonald, Love, Devin & Brinker, Dallas, Karl G. Johnson, Jr., Wilson, Grosenheider & Burns, Austin, Michael R. Hedges, Hedges & Walsh, San Antonio, Randall W. Wilson, Mary Kathryn Sammons, Susman Godfrey, Houston, Daniel L. Bates, Michael W. Minton, Decker, Jones, McMackin, McClane, Hall & Bates, Fort Worth, P. Keith O'Gorman, Michael Black, Dale Weyand, Burns & O'Gorman, San Antonio, for appellees.

Before CHAPA, PEEPLES and BIERY, JJ.

## OPINION

PEEPLES, Justice.

In this wrongful death and personal injury suit, plaintiffs appeal from an order sustaining special exceptions and dismissing their case for failure to state a cause of action. Plaintiffs contend that the air inside their mobile home contained unsafe levels of formaldehyde gas. The dismissal rests on the ground federal law preempts claims for damages caused by too much formaldehyde in the ambient air. The federal formaldehyde standards focus on the emissions from component products; plaintiffs want to litigate the level of emissions in the ambient air of the home, an approach that federal law rejects. We hold that federal law preempts the ambient air standard that plaintiffs want to urge in their state-court tort suit against the manufacturing defendants but not against the repair defendants.

Because the trial court sustained special exceptions and dismissed plaintiffs' case for failure to state a cause of action, we accept the pleaded facts as true. *El Chico Corp. v. Poole,* 732 S.W.2d 306, 309 (Tex. 1987); *City of Round Rock v. Smith,* 687 S.W.2d 300, 301 (Tex.1985). In June 1986

plaintiffs bought a used mobile home from defendant Security Pacific Housing Services, Inc., which had repossessed it from the original owner and repaired it, using nine sheets of plywood paneling bought from defendant Builder's Square, Inc. The home had been manufactured by defendant Redman Homes, Inc., which filed a third-party action for contribution and indemnity against Georgia Pacific Corporation, which had supplied wood products to Redman. In 1989 the Macmillan family filed suit for personal injuries, and various beneficiaries brought suit for the wrongful death of their mother, Nera Morgan, who lived in the home with the Macmillans until her death in February 1987.[1] Plaintiffs' Original Petition alleged that the home was unsafe "because of excessive levels of formaldehyde gas," which caused their injuries and Mrs. Morgan's death. Plaintiffs alleged four theories of recovery: strict liability, negligence, deceptive trade practices, and breach of express and implied warranties. Formaldehyde is contained in the glue that binds together the layers of wood in plywood paneling and the chips of wood in particle board.

The defendants answered and filed special exceptions contending that federal law preempts suits that allege excessive levels of formaldehyde in the air of a mobile home. Defendants cited the National Manufactured Housing Construction and Safety Standards Act of 1974, 42 U.S.C. §§ 5401–5426, and the formaldehyde regulations promulgated under that act by the Secretary of the Department of Housing and Urban Development (HUD). *See* 24 C.F.R. §§ 3280.308 et seq. (1990). The regulations expressly dictate the maximum level of formaldehyde gas that component products in mobile homes can emit, and they specify the precise warnings that must be given when a mobile home is sold. Plaintiffs did not allege that defendants had failed to comply with the federal regulations, which focus on the formaldehyde gas emitted by the component wood products. Instead

they alleged only that there was excessive formaldehyde in the air of the mobile home.

At a series of hearings the court sustained defendants' special exceptions and gave plaintiffs several chances to replead and state a cause of action not preempted by federal law. Plaintiffs stood by their original allegation that challenged the safety of the formaldehyde level in the ambient air. Eventually the court dismissed the plaintiffs' lawsuit for failure to state a cause of action, a ruling that rests explicitly on the court's conclusion that federal law preempts the plaintiffs' four theories of recovery.

■ The manufactured housing act clearly preempts state *administrative rules and regulations* that are not identical to the federal formaldehyde standards. *See* 42 U.S.C. § 5403(d); *Liberty Homes, Inc. v. Department of Indus., Labor, & Human Relations*, 125 Wis.2d 492, 374 N.W.2d 142, 153 (Ct.App.1985), *aff'd*, 136 Wis.2d 368, 401 N.W.2d 805 (1987). The question before us is whether the trial court was correct in holding that the act also preempts state law *damage suits* concerning the formaldehyde level that do not allege a violation of federal standards. We hold that the statutory scheme and the HUD regulations preempt such common-law and statutory damage suits and prevent state courts from litigating formaldehyde levels on any basis that is not identical to the HUD product standards.

## I. THE FORMALDEHYDE STANDARDS.

The record shows that when HUD adopted the product standard it specifically considered and rejected the ambient air standard that plaintiffs want to present to a court and jury as the standard of care. HUD's August 1984 report sets forth the rulemaking process that led to its formaldehyde regulations. *See* 49 Fed.Reg. 31,-996 et seq. (August 9, 1984). HUD adopted its product formaldehyde standard after

---

1. The personal-injury plaintiffs are Michael and Joyce Macmillan (the purchasers of the mobile home) and their daughter Karla. The wrongful death plaintiffs are the four adult children of the decedent Nera Morgan, who lived in the mobile home with her daughter, Joyce Macmillan.

lengthy and careful study. In June 1979 it solicited public comment about mobile home standards. In August 1981 it focused on formaldehyde emissions and "solicited comment on 21 different aspects of formaldehyde outgassing, including adverse health effects, test methods, and the economic impact of regulation." *Id.* It received comment from "individual consumers and consumer organizations, manufactured home builders, wood product producers, trade associations, government agencies, universities, and the chemical industry." *Id.* Concerning formaldehyde standards, the major issue was "whether a standard should regulate the amount of formaldehyde *in the total home environment* or the amount *emitted from the major sources* of formaldehyde in the home." *Id.* (emphasis added).

In August 1983 HUD published its proposed standards and again solicited comment from interested groups and individuals. After extending the time for submission of comments to April 1984, it received 253 comments, "many of them quite extensive." *Id.* In the meantime the standards were reviewed by the 24–member National Manufactured Home Advisory Council, which is created by Congress and whose membership is chosen in equal thirds by industry, government agencies, and consumer groups. 42 U.S.C. § 5404. After subcommittees of the council considered the standards in workshop sessions for three days, the full council made several changes.

At the end of this process, HUD adopted (effective October 29, 1984) the formaldehyde product standard that is at issue in the present litigation. 49 Fed.Reg. at 31,-996. That standard seeks to minimize the amount of formaldehyde in manufactured housing by limiting the emissions from its plywood and particle board components. "The rule requires that formaldehyde emissions not exceed 0.2 parts per million (ppm) from plywood and 0.3 ppm from particle board as measured by a specified air chamber test." *Id.* *See* 24 C.F.R. § 3280.308 et seq. HUD expressly considered and rejected an ambient air standard, such as the one that plaintiffs want to present as the standard of care in this case, which would measure the formaldehyde level in the air of the finished home. It found that the formaldehyde level in the air of the finished home will vary with the temperature, humidity, ventilation, and living habits of the homeowner. It heard arguments that these variables would make ambient air measurements unreliable. It heard opposing arguments that such variables could be controlled and factored out and that an ambient air standard could be effective and accurate.

After considering the competing arguments, HUD concluded that the product standard would be more effective and easier to enforce. According to its report, the component wood products of a mobile home are easy to test under standardized conditions, which avoids the difficulty of "compensating for variations in home temperature and humidity levels." The product standard also permits detection of a potential formaldehyde problem before the home has already been constructed. "Therefore, based on its effectiveness, the availability of reliable test methods, and the potential to prevent formaldehyde problems before the homes are sold, [HUD] concluded that a product standard is appropriate." 49 Fed. Reg. at 31,997.

HUD balanced many competing factors and resolved several conflicting contentions. It recognized that in warmer parts of the country formaldehyde emissions may increase, and that some groups (such as the elderly, small children, and those suffering from allergies or other respiratory ailments) may be more affected by formaldehyde in the air than the population generally. Concerning the seriousness of formaldehyde's irritant effects, HUD found the evidence inconclusive and decided to continue studying the matter and change the standards if further research justified it. HUD heard arguments that the allowable level of formaldehyde emissions should be lower, and arguments that the level should be higher. It evaluated different kinds of testing procedures. It considered the cost of testing and of compliance with its standards. Its health notice

shows an awareness that goals of energy efficiency and mobile home ventilation can conflict with each other; the notice says that "[r]educed ventilation resulting from energy efficiency standards"—that is, making homes more airtight—may contribute to accumulation of formaldehyde and other contaminants in the indoor air. 24 C.F.R. § 3280.309(a) (1990).

Rather than dictate each detail, HUD left several decisions up to the consumer and required that essential information be given at the time of sale. The regulations require each seller to offer the buyer a ventilation improvement option, together with information about the choices available. 24 C.F.R. § 3280.710(g) (1990). HUD also wrote and mandated a concise and understandable health notice, reproduced in the margin,[2] which (1) spells out the possible health effects and symptoms caused by formaldehyde exposure, (2) identifies the particularly susceptible population groups, and (3) calls attention to the importance of ventilation, temperature, and humidity.

In summary, HUD considered such competing factors as ease and effectiveness of testing (types of testing, the need to allow for humidity, temperature, ventilation, and other variables), available technology and knowledge, the health impact of different levels of formaldehyde, cost, and the benefits of detecting excessive emissions before assembly. Representatives of the government, the industry, and consumer organizations made extensive comments and also participated on HUD's advisory council.

## II.  PREEMPTION.

Under the supremacy clause state law is preempted in three different situations:

[1] when Congress, in enacting a federal statute, has expressed a clear intent to pre-empt state law; [2] when it is clear, despite the absence of explicit pre-emptive language, that Congress has intended, by legislating comprehensively, to occupy an entire field of regulation and has thereby "left no room for the States to supplement" federal law; and [3] when compliance with both state and federal law is impossible, or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 699, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580 (1984) (citations omitted). The Court has recently reaffirmed these well-settled preemption principles. *See English v. General Elec. Co.,* 496 U.S. 72, ——, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65, 74 (1990). Federal regulations can preempt state law just as completely as federal statutes. *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985); *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. at 699, 104 S.Ct. at 2700; *Fidelity Fed. Savings & Loan Ass'n v. de la Cues-*

---

**2.** The regulations require that the following notice, using a specified typeface, be "prominently displayed in a temporary manner in the kitchen (i.e., countertop or exposed cabinet face)" and in the consumer manual:

### IMPORTANT HEALTH NOTICE

Some of the building materials used in this home emit formaldehyde. Eye, nose, and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure. Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk. Research is continuing on the possible long-term effects of exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air. Additional ventilation to dilute the indoor air may be obtained from a passive or mechanical ventilation system offered by the manufacturer. Consult your dealer for information about the ventilation options offered with this home.

High indoor temperatures and humidity raise formaldehyde levels. When a home is to be located in areas subject to extreme summer temperatures, an air-conditioning system can be used to control indoor temperature levels. Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system.

If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department.

24 C.F.R. § 3280.309(a).

*ta,* 458 U.S. 141, 153–54, 102 S.Ct. 3014, 3022–23, 73 L.Ed.2d 664 (1982).

Congress made clear that on matters covered by the manufactured housing act, federal law is supreme and state standards cannot deviate from them in the slightest detail. 42 U.S.C. § 5403 provides:

### (d) Supremacy of Federal standards

Whenever a Federal manufactured home construction and safety standard established under this chapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any manufactured home covered, any standard regarding construction or safety applicable to the same aspect of performance of such manufactured home which is not identical to the Federal manufactured home construction and safety standard.

The HUD regulations contain a similar preemption statement. *See* 24 C.F.R. § 3282.-11(a) (1990). HUD also said bluntly that its standards preempt state standards: "It is HUD's intention that these standards preempt State and local formaldehyde standards in accordance with the Act." 49 Fed.Reg. at 31,997.

Congress itself did not establish formaldehyde standards, but HUD did so through the rulemaking process reviewed above, which lasted from 1979 to 1984. Section 5403(a) of the act authorized HUD to do this, and plaintiffs do not complain about the lawfulness of the process that produced the formaldehyde standards. In dealing with formaldehyde levels, HUD consciously chose to adopt a product standard instead of an ambient air standard.

■ Plaintiffs argue that notwithstanding the statute's preemption language, its savings clause permits states to entertain common-law suits and establish additional formaldehyde standards by judicial decision. 42 U.S.C. § 5409 provides:

(c) Compliance with any Federal manufactured home construction or safety standard issued under this chapter does not exempt any person from any liability under common law.

Plaintiffs interpret § 5409(c) to mean that courts can impose liability for levels of formaldehyde in the air that juries consider too high, even though the defendant has complied fully with HUD's component product standards. At bottom, plaintiffs contend that state courts can assess liability for failure to meet an ambient air standard that HUD expressly considered and rejected when it chose the component product standard.

■ We must construe § 5409(c) consistently with the rest of the statute. In § 5422(a) Congress said that state agencies and courts can act on safety issues that have not been addressed by federal law. 42 U.S.C. § 5422 (entitled "State enforcement") provides:

### (a) Jurisdiction of State agency or court under State law

Nothing in this chapter shall prevent any State agency or *court* from asserting jurisdiction under State law over any manufactured home construction or *safety issue with respect to which no Federal manufactured home construction and safety standard has been established* pursuant to the provisions of section 5403 of this title.

42 U.S.C. § 5422(a) (emphasis added). Section 5422(a) amounts to a statement that the act prevents state courts and agencies from asserting jurisdiction over manufactured housing safety issues with respect to which a federal standard has been established. By saying that state courts *can* take jurisdiction over matters *not* covered by federal law, § 5422(a) means also that state courts *cannot* take jurisdiction over matters that *are* covered.[3]

---

**3.** Section 5422(a) fits within the rule that "the express mention of one thing is tantamount to an exclusion of all others, and affirmative words imply a negative of what is not affirmed, and negative words imply an affirmative of

what is not negatived." *Ex parte Halsted,* 147 Tex.Crim. 453, 182 S.W.2d 479, 484 (1944).

Seven members of the Supreme Court have recognized essentially the same principle of textual construction in capital punishment cases,

We believe that §§ 5409(c) and 5422(a) can be reconciled. They mean that state courts can litigate safety issues that are not covered by federal standards, and that compliance with federal law does not shield a defendant from such suits concerning matters not covered by federal law. The two provisions clearly serve a useful purpose by specifying the extent to which the statute implicitly preempts state law. They eliminate any suggestion that federal regulation of *certain aspects* of safety in manufactured housing (such as formaldehyde and fire safety) preempts and occupies the *entire field* of liability involving manufactured housing. They represent Congress's way of saying that when it entered the field of manufactured home safety *partially*, it did not mean to preempt the field *entirely*. In the absence of § 5409(c), a defendant in compliance with federal formaldehyde or fire standards could argue that federal law occupies the safety field and therefore implicitly preempts the states' authority to litigate other kinds of safety issues (such as electrical wiring or strength of the structure). This is essentially what the Supreme Court meant in an interstate commerce case, when it said, "Without this [savings] provision [4] ... 'it might have been claimed that, Congress having entered the field, *the whole subject* of liability of carrier to shippers in interstate commerce had been withdrawn from the jurisdiction of the state courts....'" *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 328, 101 S.Ct. 1124, 1135–36, 67 L.Ed.2d 258 (1981) (emphasis added) (quoting *Pennsylvania Ry. Co. v. Puritan Coal Mining Co.*, 237 U.S. 121, 130, 35 S.Ct. 484, 487, 59 L.Ed. 867 (1915)).

Plaintiffs would have us hold that § 5409(c) authorizes common-law liability when there is a federal standard and the defendant has complied with it, and that § 5422(a) authorizes liability under state law where there is no standard at all. In other words, in two different parts of the statute, Congress said there is potential state-law liability on matters covered and on matters not covered. That would be a strange way of drafting when Congress could have said simply that states can litigate safety issues regardless of the presence or absence of a federal standard. We cannot accept that construction of the statute and attribute such clumsy drafting to Congress. In our view the two provisions complement each other. Section 5422(a) means that state courts can enforce state law in areas that Congress and HUD did not reach, and in such suits, under § 5409(c) mere compliance with whatever standards exist does not exempt a defendant from liability.

We are cited *Turner v. General Motors Corp.*, 514 S.W.2d 497 (Tex.App.—Houston [14th Dist.] 1974, writ ref'd n.r.e.), which held that certain motor vehicle safety standards "were meant to supplement rather than obviate the law of negligence and products liability." *Id.* at 506. The statute involved in *Turner* included a savings pro-

---

reasoning that the Fifth and Fourteenth Amendments contemplate capital punishment by saying when it *cannot* be administered. The Fifth Amendment provides:

No person shall be held to answer for a capital, or otherwise *infamous crime*, unless on a presentment or indictment of a Grand Jury ...; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; ... nor be deprived of life, liberty, or property, without due process of law....

Similarly, the Fourteenth Amendment says that no state shall deprive any person of "life, liberty, or property" without due process of law. In view of these references in the negative to "capital" crimes and deprivation of "life," it was clear to the Supreme Court majority that the constitution contemplates capital punishment, so long as due process and other procedural safeguards are observed. *See Gregg v. Georgia*, 428 U.S. 153, 177, 96 S.Ct. 2909, 2927, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, & Stevens, JJ.); *Roberts v. Louisiana*, 428 U.S. 325, 350–51, 96 S.Ct. 3001, 3014, 49 L.Ed.2d 974 (1976) (opinion of White, J., joined by Burger, CJ. and Blackmun, & Rehnquist, JJ.).

**4.** The savings provision, 49 U.S.C. § 10103, said that nothing in the act "shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies." The statute now provides, "Except as otherwise provided in this subtitle, the remedies provided under this subtitle are in addition to remedies existing under another law or at common law."

vision identical to the one involved here. *See* 15 U.S.C. § 1397(k) (Supp.1991) [numbered § 1397(c) at the time of *Turner*]. But the motor vehicle statute at issue in *Turner* did not say that state courts could assume jurisdiction over safety issues with respect to which there is no federal standard, as § 5422(a) of the manufactured housing act does. As we have held, § 5422(a) means that state courts *cannot* assume jurisdiction over safety issues on which HUD *has* set a standard. The *Turner* court's interpretation of the motor vehicle statute does not aid us in interpreting the statute and formaldehyde regulations before us.

Plaintiffs also cite *Carlisle v. Philip Morris, Inc.*, 805 S.W.2d 498 (Tex.App.—Austin 1991, no writ), which held that the Federal Cigarette Labeling and Advertising Act does not preempt state-law tort suits alleging failure to warn adequately about the dangers of cigarette smoking. *Id.* at 517. The *Carlisle* court held that the federal standards are minimum standards and that the states can supplement them through tort litigation. We do not consider *Carlisle* controlling or persuasive.[5] *Carlisle* construed a different statute, which did not contain express preemption provisions comparable to 42 U.S.C. §§ 5403(d) and 5422(a), on which we have placed considerable reliance. Unlike *Carlisle*, ours is an express preemption case.

The *Carlisle* court bolstered its preemption decision by noting that the federal labeling act provided no remedy to an injured smoker. 805 S.W.2d at 511–13. Plaintiffs urge us to use the same reasoning. But the manufactured housing act does not deny an injured party the right to bring a lawsuit and seek compensation; it simply denies him the right to allege a theory of liability different from the federal product standard. We are aware of no principle of federal law that denies Congress the right to adjust and modify the grounds on which litigants can seek recovery in tort, provided that the act of Congress lies within its constitutional authority, as the act before us concededly does. The act preempts only those state standards that differ from federal standards, and we are not prepared to say that Congress meant to keep an injured party from bringing a tort suit that alleges a violation of the federal standards themselves. *See* PROSSER & KEETON ON THE LAW OF TORTS § 36, at 221 (5th ed. 1984) ("whether to imply a private cause of action into a federal statute resolves to a question of Congressional intent"). Congress did not deny plaintiffs a remedy; it denied them a remedy only if the component parts of their mobile home met federal standards. Congress and HUD are certainly entitled to mandate that when a manufacturer meets federal standards it cannot be sued for failure to comply with a different standard adopted by a state. We think that Congress and HUD have done exactly that.

■ Plaintiffs also contend that the statute and regulations preempt only state *standards* and that state *judgments* remain untouched. To put it differently, plaintiffs argue that federal law preempts only state legislative and administrative action, but not judicial action. We reject this contention. To begin with, § 5422, quoted above, indicates Congress's intent to let state courts assert jurisdiction only over safety issues that have been left alone by federal law. That section permits state *courts* to assert jurisdiction over manufactured housing safety issues when there is no federal standard on the subject. We hold that the act expressly preempts state court jurisdiction to litigate safety issues involving formaldehyde, which are covered by a federal standard.

Our conclusion is bolstered by the principle that state law is preempted "when it is clear, despite the absence of explicit preemptive language, that Congress has intended by legislating comprehensively, to

---

**5.** Our task is not simply to decide whether to "follow" *Carlisle*, which itself did not follow the vast majority of federal and state decisions that had found preemption. If we considered *Carlisle* to be on point, we would have to decide which line of conflicting precedents to follow. The issue is presently before the Supreme Court. *See Cipollone v. Liggett Group, Inc.*, 893 F.2d 541 (3d. Cir.1990), *cert. granted*, — U.S. ——, 111 S.Ct. 1386, 113 L.Ed.2d 443 (1991).

occupy an entire field of regulation and has thereby left no room for the States to supplement federal law." *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 699, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580 (1984) (internal quotation marks omitted). We think it clear that Congress and HUD have dealt comprehensively with the field of formaldehyde safety and left no room for state supplementation.

■ State decisional law is not allowed to interfere with and subvert a federal scheme when state administrative rules and statutes are barred from doing so. Court judgments for damages can undermine federal law and affect the behavior of those who have fully complied with it just as completely as state statutes and administrative rules. To prevent disruption of federal regulations, the Supreme Court has held in labor cases that state common-law suits and judicial remedies are preempted just as legislative rules are. Indeed, when state court intervention would disrupt the federal labor scheme, the Court has prevented states from providing judicial remedies for conduct *prohibited or protected* by federal law. *See Wisconsin Dep't of Industry v. Gould, Inc.,* 475 U.S. 282, 286, 106 S.Ct. 1057, 1061, 89 L.Ed.2d 223 (1986); *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 246–47, 79 S.Ct. 773, 780–81, 3 L.Ed.2d 775 (1959). The Court said in *Garmon:*

> [State] regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.

*Id.* at 247, 79 S.Ct. at 780. Similarly, in an environmental protection case the Court recently said of a similar savings provision, "we do not believe Congress intended to

undermine this carefully drawn statute through a general saving clause.... It would be extraordinary for Congress, after devising an elaborate permit system that sets clear standards, to tolerate common-law suits that have the potential to undermine this regulatory structure." *International Paper Co. v. Ouellette,* 479 U.S. 481, 494, 497, 107 S.Ct. 805, 812–13, 814, 93 L.Ed.2d 883 (1987). Since *Garmon,* the Supreme Court has continued to police the boundary between federal and state jurisdiction in labor disputes. But we are aware of no Supreme Court decision that undermines its *Gould–Garmon* observation of the obvious truth that damage awards can "govern" conduct and have regulatory effect, and that state common-law actions are subject to preemption just as state legislative and regulatory standards are.

■ In the case of manufactured housing, state judgments for damages have the same potential to affect the behavior of manufacturers and thereby override the federal rule and upset the balance already struck by Congress and HUD. Indeed that is one of the very purposes of tort law. One objective of tort litigation is to modify the defendant's behavior—and the behavior of others who want to engage in the same conduct—by deterring conduct considered after the fact to be unreasonable, an objective that is said to be more effective on large business units than on individuals. *See* F. HARPER, F. JAMES, & O. GRAY, THE LAW OF TORTS § 12.4, at 120–24, § 25.22, at 657–58 (2d ed. 1986); PROSSER & KEETON ON THE LAW OF TORTS § 4, at 25–26 (5th ed. 1984).[6] A basic premise of our tort system is that corporate actors will respond to the threat of damages by changing their conduct.

Because one of tort law's goals—and one of its results—is to deter conduct and

---

6. Prosser and Keeton discuss deterrence of wrongdoers as one of the objectives of tort law:

> The "prophylactic" factor of preventing future harm has been quite important in the field of torts. The courts are concerned not only with compensation of the victim, but with admonition of the wrongdoer. When the decisions of the courts become known,

and defendants realize that they may be held liable, there is of course a strong incentive to prevent the occurrence of the harm. Not infrequently one reason for imposing liability is the deliberate purpose of providing that incentive.

PROSSER & KEETON ON THE LAW OF TORTS § 4, at 25.

shape behavior, we are not persuaded by the statement in *Carlisle v. Philip Morris* that "[b]y awarding damages, courts do not *compel* any behavior, other than requiring a particular defendant to pay compensation to a particular plaintiff." 805 S.W.2d at 509 (emphasis in original). If that is true, we might as well go the full distance and say that the criminal law and administrative regulations do not *compel* any behavior other than to require a particular defendant to serve a prison term or pay a fine. Of course the law achieves its goals imperfectly, whether acting through the criminal sanction, administrative regulations, equitable relief, or suits for damages. But that does not mean that it does not seek to affect behavior or shape it at all.

Deterrence is an especially visible goal in suits for exemplary damages, which plaintiffs' preemption analysis would necessarily allow. Deterrence of undesirable behavior—setting an example—and punishment for it are perhaps the primary purposes of punitive, or exemplary, damages in Texas. *See Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 555 (Tex. 1985) ("Punitive damages are intended to punish the defendant and to set an example to others"); *Hofer v. Lavender*, 679 S.W.2d 470, 474–75 (Tex.1984) (punitive damages exist to punish wrongdoers, to set an example to others, and to reimburse for remote losses). In the present case, plaintiffs have not sought exemplary damages, but if the state courts can entertain their ambient air theory of recovery, we know of no reason why they and others could not plead and try to obtain such relief.

Moreover, under the plaintiffs' interpretation of §§ 5403(d) and 5409(c), presumably a state court could issue injunctions requiring that every mobile home sold in Texas meet formaldehyde standards that differed radically from the federal standards. A tort judgment or a series of judgments for large damages could have the same effect, enabling Texas and other states to require that the industry deviate from the federal standards so carefully crafted by HUD.

Congress said that if states want to regulate safety matters that federal law already covers, the regulations must be "identical." 42 U.S.C. § 5403(d). We cannot believe that Congress and HUD meant to allow states to affect the manufacturing of mobile homes so drastically by setting standards through their courts that would be totally different from the federal standards. In this regard, we heed the Supreme Court's recent observations about a different statute:

> Particularly disruptive is the potential for conflict in substantive law. It is foreseeable that state courts, exercising their common law powers, might develop different substantive standards applicable to the same employer conduct, requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction. Such an outcome is fundamentally at odds with the goal of uniformity that Congress sought to implement.

*Ingersoll–Rand Co. v. McClendon*, 498 U.S. ——, ——, 111 S.Ct. 478, 484, 112 L.Ed.2d 474, 486 (1990). Court judgments pose the same threat to uniformity of standards in manufactured housing.

For the reasons stated, we hold that federal law preempts state authority to entertain plaintiffs' damage suit alleging an excessive level of formaldehyde in the air of the mobile home. We affirm the order dismissing the cause against defendants Redman and Georgia Pacific.

### III. PREEMPTION OF CLAIMS AGAINST REPAIR DEFENDANTS.

Plaintiffs pleaded that Security Pacific repossessed the home and renovated it with nine sheets of plywood bought from Builders Square. Plaintiffs did not allege that these two defendants violated the act's component product standards; they alleged that the act does not apply to repair defendants. The court dismissed plaintiffs' case against Security Pacific and Builders Square on the sole ground that federal law preempts the state-law case against them.

At this point in the litigation, neither defendant has contested liability on any other basis.[7]

We believe that federal law does not expressly or implicitly preempt such suits against Security Pacific or Builders Square. They are alleged to have done repair work on a used mobile home and furnished plywood for repairs. There is no suggestion that they had anything to do with the manufacture of it. The allegations against the two repair defendants are not preempted under any of the three kinds of preemption—express, implied, and conflict preemption. *See English v. General Electric Co.,* 496 U.S. 72, ——, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65, 74 (1990); *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 699, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580 (1984).

It is true that the act regulates the manufacture *and safety* of mobile homes. But we see no indication that Congress or HUD gave any thought to the *repair* of *used* homes. The act does not expressly preempt suits involving repair work and the furnishing of materials for repairs. Nor can we infer that Congress implicitly meant to preempt suits involving repairs simply because it legislated comprehensively about the manufacture of such housing. And we cannot say that to allow suits against repairmen will create an obstacle to the goals of the statute and HUD's regulations. We therefore must reverse the order dismissing the suits against Security Pacific and Builders Square, which rests solely on federal preemption.

We affirm the orders of dismissal in favor of Redman and Georgia Pacific. We reverse the orders of dismissal in favor of Security Pacific and Builders Square and remand the causes against them to the trial court for further proceedings.

---

7. Security Pacific urges on appeal that the Texas Manufactured Housing Standards Act bars the suit. *See* TEX.REV.CIV.STAT.ANN. art. 5221f (Vernon 1987 & Supp.1991). It also says that it did not sell the home to plaintiffs, but merely financed the sale. Similarly, Builders Square contends that it should not be liable for simply selling nine sheets of plywood, unaware of their intended use, without proof that the plywood was defective.

But neither defendant made these arguments in the trial court, and the court did not rest its dismissal on them. Our review is limited to the sole ground urged in the special exceptions—preemption—on which the trial court rested its dismissal. Nothing in this opinion prevents these two defendants from arguing non-preemption grounds on remand.