**REDMAN HOMES, INC., Appellant,**

v.

**Jimmy D. IVY and Ida Earlene Ivy, Appellees.**

No. 08–94–00016–CV.

Court of Appeals of Texas, El Paso.

May 11, 1995.

Rehearing Overruled June 7, 1995.

Cecil Kuhne, Crenshaw, Dupree & Milam, Lubbock, Joe C. Nagy, Crenshaw, Dupree & Milam, L.L.P., Lubbock, for appellant.

Abner Burnett, Burnett & Burnett, Inc., Odessa, for appellees.

Before BARAJAS, C.J., and McCLURE and CHEW, JJ.

## OPINION

BARAJAS, Chief Justice.

Redman Homes appeals a $122,702.78 judgment in favor of Appellees for breaches of implied warranties and for deceptive trade practices in connection with Appellees' mobile home, which Appellant manufactured. The jury found for Appellees on both claims and assessed damages at $79,000, which, together with attorney's fees and pre-judgment interest, resulted in the judgment amount. We affirm in part, reverse in part, and remand this cause to the trial court for a new trial to determine the damages incurred by Appellees.

### I. SUMMARY OF THE EVIDENCE

Appellant manufactures mobile homes. In March of 1988, Appellees purchased a mobile home manufactured by Appellant and located it in Gaines County, Texas, using it as their residence. In January of 1989, the mobile home and all its contents were destroyed by fire. Appellees sued Appellant, claiming that defective wiring installed in the home by Appellant was the cause of the fire.

Appellees' first amended original petition alleges breaches of the implied warranties of merchantability and fitness for a particular purpose. The petition also alleges violations of the Deceptive Trade Practices–Consumer Protection Act (DTPA), TEX.BUS. & COM.CODE ANN. §§ 17.41–17.63 (Vernon 1987 and Supp. 1995).

### II. DISCUSSION

Appellant attacks the judgment of the trial court in eight points of error. In its first two points of error, Appellant argues that Appellees' claims are preempted by the National Manufactured Home Construction and Safety Standards Act (NMHCSSA), 42 U.S.C.A. §§ 5401–5426 (West 1983 and Supp.1994).

#### A. Preemption

■ The doctrine of federal preemption is rooted in the supremacy clause of Article VI of the United States Constitution, which provides that the laws of the United States "shall be supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." *Cipollone v. Liggett Group, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992); *Moore v. Brunswick,* 889 S.W.2d 246, 247 (Tex.1994). Thus, since *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 427, 4 L.Ed. 579 (1819), it has been settled that state law that conflicts with federal law is "without effect." *Cipollone v. Liggett Group, Inc.,* —— U.S. at ——, 112 S.Ct. at 2617 (1992). Preemption analysis begins with the presumption that the historic police powers of the States are not to be superseded by federal legislation "unless that is the clear and manifest purpose of Congress." *Id.* (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). Accordingly, the "ultimate touchstone" of preemption analysis is congressional intent. *Id.; Moore v. Brunswick,* 889 S.W.2d at 247.

■ Federal law may supersede state law in one of several different ways. First, Congress may plainly express its preemptive intent in the text of a federal statute. *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381–83, 112 S.Ct. 2031, 2036, 119 L.Ed.2d 157 (1992); *Moore v. Brunswick,* 889 S.W.2d at 247. Second, preemption may

be presumed if federal legislation "so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." *Cipollone v. Liggett Group, Inc.,* —— U.S. at ——, 112 S.Ct. at 2617 (internal quotations omitted). Finally, state law is preempted to the extent it actually conflicts with federal law. *Id.; Moore v. Brunswick,* 889 S.W.2d at 248. State law conflicts with federal law when it is impossible to comply with both, *Hillsborough County v. Automated Medical Lab., Inc.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985); *Moore v. Brunswick,* 889 S.W.2d at 248, or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, *Capital Cities Cable, Inc., v. Crisp,* 467 U.S. 691, 699, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580 (1984); *Eli Lilly and Co. v. Marshall,* 850 S.W.2d 155 (Tex. 1993). Significantly, federal regulations can preempt state law just as completely as federal statutes. *Hillsborough County v. Automated Medical Lab., Inc.,* 471 U.S. at 713, 105 S.Ct. at 2375; *Macmillan v. Redman Homes, Inc.,* 818 S.W.2d 87 (Tex.App.—San Antonio 1991, writ denied).

### 1. The Legislation

The NMHCSSA and the administrative regulations promulgated under its authority establish construction and safety standards for mobile homes and many of their component parts, including the electrical wiring at issue in the instant case. *See* 42 U.S.C.A. § 5403(a) (West 1983) (authorizing Department of Housing and Urban Development to promulgate regulations); 24 C.F.R. §§ 3280.801–3280.816 (1994) (code sections comprising "Subpart I—Electrical Systems").

■ The NMHCSSA expressly preempts certain state law. The section of the act entitled "Supremacy of Federal standards" reads:

1. Section 5422(a) actually contemplates state suits to enforce independent state standards. It reads:
   Nothing in this chapter shall prevent any State agency or court from asserting jurisdiction under State law over any manufactured home construction or safety issue with respect

Whenever a Federal manufactured home construction and safety standard established under this chapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect ... any standard regarding construction or safety applicable to the same aspect of performance of [a] manufactured home which is not identical to the Federal manufactured home construction and safety standard.

42 U.S.C.A. § 5403(d) (West 1983). The scope of this provision is deliberately limited. By its terms, Section 5403(d) preempts only state **construction and safety** standards, which necessarily implies that state standards unrelated to construction and safety are not preempted. Further, it preempts only those state construction and safety standards that **differ** from federal standards, which leads to the logical inference that identical state standards, though they concern construction and safety, are not preempted. Further still, the NMHCSSA makes clear that it does not preempt state standards with respect to attributes for which there is no corresponding federal standard. *Id.* at § 5422(a).[1]

A section of the administrative regulations promulgated pursuant to the NMHCSSA reveals a different axis by which the Act's preemptive scope is limited and illuminates the States' permissible regulatory role. A code provision entitled "Preemption and reciprocity" reads in part:

A State may establish or continue in force consumer protections, such as warranty or warranty performance requirements, which respond to individual consumer complaints and so do not constitute systems of enforcement of the Federal standards....

24 C.F.R. § 3282.11(c) (1994).

Appellant asserts that the foregoing provisions preempt Appellees' claims in their entirety. Given the limited preemptive scope

to which no Federal manufactured home construction and safety standard has been established pursuant to the provisions of section 5403 of this title.
42 U.S.C.A. § 5422(a) (West 1983) (emphasis added).

of the NMHCSSA, its assertion raises two issues. First, is a lawsuit in state court that alleges breaches of implied warranties and DTPA violations an attempt to enforce a construction or safety standard?[2] Second, if it is, do the particular claims Appellees pled attempt to enforce standards that differ from the federal standards?

## 2. Prior Case Law

The United States Supreme Court recently addressed a similar preemption issue in *American Airlines, Inc. v. Wolens,* — U.S. ——, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995), in which the class-action plaintiffs claimed that by reducing the utility of frequent flier mileage credits, i.e., by increasing the credits required to earn free travel, the defendant breached a contract and violated Illinois's Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act). At issue in *Wolens* was the Airline Deregulation Act of 1978 (ADA), Pub.L.No. 95–504, 92 Stat. 1705, (codified as amended largely in scattered sections of 49 U.S.C.A. (West Supp. 1994)), which deregulated domestic air transport and barred states from "enacting or enforcing any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier." 49 U.S.C.A. App. § 1305(a)(1) (West Supp.1994). American argued that the plaintiffs' claims were barred by the ADA.

The Supreme Court discerned the preemptive scope of the provision by distinguishing between state-imposed and self- or party-imposed obligations, holding only the former preempted. *American Airlines, Inc. v. Wolens,* — U.S. at ——, 115 S.Ct. at 823–24. The Court reasoned that self-imposed obligations, such as those embodied in a contract to which one agrees, are "privately ordered obligations" that do not constitute state enactment or enforcement as the statute requires, even when one of the parties seeks to invoke the power of state courts to enforce the contract. *American Airlines, Inc. v. Wolens,* — U.S. ——, 115 S.Ct. at 824. The Court therefore held the plaintiffs' contract claims not preempted by federal law and allowed them to proceed. *Id.* In contrast, the Court found the plaintiffs' Consumer Fraud Act claims to be based on state-imposed norms, which provided the requisite state action to fall within the preemptive scope of the ADA. *American Airlines, Inc. v. Wolens,* — U.S. at ——, 115 S.Ct. at 823–24.

Interestingly, the Court was careful to avoid identifying the norms imposed by the Illinois Consumer Fraud Act, and did not actually state that the Act imposed such norms. The Court apparently held the claims preempted as a prophylactic measure, finding that the Consumer Fraud Act "serves as a means to guide and police the marketing practices of the airlines" and that the "potential for intrusive regulation ... [is] inherent in state consumer protection legislation." *American Airlines, Inc. v. Wolens,* — U.S. at ——, 115 S.Ct. at 823 (emphasis added). The *Wolens* Court relied heavily on *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992), which involved the same federal statute. The Court's conclusion in *Wolens* that the Illinois Consumer Fraud Act, which on its face concerns only fraudulent activity as defined in the Uniform Deceptive Trade Practices Act, had the potential to incorporate substantive regulation otherwise preempted by federal law was bolstered by the facts in *Morales,* in which several states attempted to so use their consumer protection statutes.[3]

---

2. The more obvious means to enforce non-federal standards is through legislation. *See Scurlock v. City of Lynn Haven,* 858 F.2d 1521 (11th Cir. 1988) (city zoning ordinance preempted because it barred mobile homes from certain areas unless they met local safety standards). Appellant makes no claim that state legislation is preempted. Thus, the issue is whether state court lawsuits may similarly constitute attempts to enforce non-federal standards. As we make clear below, assuming they do, the particular standard sought to be enforced, and consequently whether it is preempted, depend on precisely how the cause of action is pled.

3. Texas was one of them. The nominal plaintiff in *Morales* was Dan Morales, Attorney General of the State of Texas. The substantive standards at issue were "guidelines" composed by a committee of the National Association of Attorneys General that purported to "create [no] new laws or regulations," but merely "explain in detail how existing state [general consumer protection] laws apply to air fare advertising and frequent flyer

Turning from the general to the specific, we now examine the several cases, more than one of which involve Appellant, that have addressed the preemptive scope of the NMHCSSA. With respect to the first issue we identified in Appellant's preemption argument, cases involving Section 5403(d), the NMHCSSA's preemption provision, have largely assumed that state court lawsuits are capable of constituting attempts to enact or enforce standards. *See, e.g., Macmillan v. Redman Homes, Inc.,* 818 S.W.2d at 94 (avoiding question whether plaintiffs could bring state law tort suit for violations of federal regulatory standards). Deceptive–Trade–Practices-like lawsuits, however, have been found not preempted by the NMHCSSA because such claims do not attempt to impose safety or construction standards. *See Woolridge v. Redman Homes, Inc.,* 792 F.Supp. 1469, 1471 (N.D.Tex.1991) ("The Texas DTPA allows for a remedy for undesirable conduct; it does not set any safety or construction standards."); *Gatlin v. Countryside Indus., Inc.,* 564 F.Supp. 1490, 1495 (N.D.Tex.1983) (finding removal improper and federal jurisdiction lacking because state law, unlike federal law, provides for individual relief and because "Texas state courts are certainly qualified to interpret the state's statutory and common law provisions on contract, warranty, misrepresentation, fraud, strict liability, ... negligence[, and deceptive trade practices].")[4]; *see also Shorter v. Champion Home Builders Co.,* 776 F.Supp. 333, 338 (N.D.Ohio 1991) ("[W]hile the state of Ohio may not institute its own safety standards, state law [products liability] claims may still be brought.").

At least one case has shed light on the second of the two issues raised by Appellant's preemption argument. The case of *Macmillan v. Redman Homes, Inc.,* 818 S.W.2d at 87, found the preemptive effect of the NMHCSSA to be very sensitive to the particulars of the cause of action pled by a plaintiff. The plaintiffs in *Macmillan* sued for damages caused by excessive levels of formaldehyde in the air inside their mobile home. *Id.* at 88. Federal regulations, however, regulate only the formaldehyde emission levels from component products, not the overall level of formaldehyde in indoor air. *Id.* at 88–89. The San Antonio Court of Appeals therefore held the plaintiffs' claims preempted by federal law because of the fashion in which they pled them, but expressly reserved judgment on whether a plaintiff could bring a tort suit in state court that alleged violations of federal regulations. *Id.* at 94.

### 3. Appellant's Claims

■ The specific claims Appellees pled are not preempted. As *Woolridge* correctly finds, the Texas Deceptive Trade Practices Act provides a remedy for undesirable conduct, namely, fraud and its equivalent; it imposes no substantive safety or construction standards. Since the NMHCSSA preempts only those state laws that impose safety or construction standards, Appellees' DTPA claims are not preempted. That *Wolens* finds a similar claim under the Illinois consumer protection statute preempted does not alter our conclusion. First, the federal law at issue in *Wolens* contains a preemptive provision that bars any "law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier," 49 U.S.C.A. App. § 1305(a)(1) (West Supp.1994), which is much broader than Section 5403(d) of the NMHCSSA, which bars only "standards." Although we have difficulty identifying with exhaustive precision the items encompassed by one provision and not the other, we are confident that the ADA's deliberate, methodical statement of application to specific and more numerous issues is to some extent

programs." *Morales v. Trans World Airlines, Inc.,* 504 U.S. at 377–79, 112 S.Ct. at 2034. The Supreme Court held the state laws preempted. *Morales v. Trans World Airlines, Inc.,* 504 U.S. at 391–93, 112 S.Ct. at 2041.

**4.** *Gatlin* distinguishes between Texas' remedial and regulatory jurisdiction, finding only the latter circumscribed by federal law. *Gatlin* relies on section 3282.11(c) of title 24 of the Code of Federal Regulations, *supra,* for the proposition that the NMHCSSA's limited preemptive scope leaves the states vested with "residual power ... to make available conventional remedies for individual purchasers." *Gatlin v. Countryside Indus., Inc.,* 564 F.Supp. at 1493.

broader than the NMHCSSA's pedestrian proscription of state "standards." Thus, we may safely conclude that Congress did not intend the NMHCSSA to have a preemptive scope as broad as that of the ADA.

Second, the *Wolens* decision was in part motivated by the Airline Deregulation Act's general theme: deregulation. *See American Airlines, Inc. v. Wolens,* —— U.S. at ——, 115 S.Ct. at 823 (finding ADA's purpose is to leave selection and design of marketing mechanisms to the airlines). The NMHCSSA, in contrast, was intended to reduce personal injuries and property damage resulting from mobile home accidents and to improve their quality and durability. 42 U.S.C.A. § 5401 (West 1983).

■ Third, *Wolens's* concern for the potential for a consumer protection statute like the Texas DTPA to be used as a means to enforce substantive standards embodied in other state law does not exist in the instant case because the NMHCSSA carefully preempts only those state safety and construction standards that differ from federal standards. No such standards, such as the NAAG guidelines at issue in *Morales,* have yet been incorporated into the Texas DTPA with respect to mobile homes. Moreover, no such standards will be so incorporated because Texas has expressly adopted federal standards in its own Manufactured Housing Standards Act. TEX.REV.CIV.STAT.ANN. art. 5221f, § 4(a) (Vernon Supp.1995). Thus, Texas has assured that any safety or construction standards it imposes or enforces on mobile homes will fall outside the preemptive scope of the NMHCSSA.

■ Fourth, that Section 5403(d) preempts only differing state standards reflects that Congress carved out some regulatory, or at least remedial, role for states, unlike the ADA, which *Wolens* finds was intended to altogether remove airline marketing practices from state purview. This conclusion is supported by the administrative code provision that allows states to "continue in force consumer protections, such as war-

ranty or warranty performance requirements, which respond to individual consumer complaints." 24 C.F.R. § 3282.11(c) (1994). We conclude that Appellees' deceptive trade practices claim is among the species of traditional consumer protections that falls within the ambit of residual state authority which Congress left undisturbed.

■ We reach the same conclusion with respect to Appellees' warranty claims. We do not pause to examine whether implied warranties constitute state-imposed standards because *Wolens* quite explicitly finds that common law suits in contract, like Appellees' warranty claims, are privately-ordered obligations that are not "enforced" or "enacted" by the state.[5] To be sure, implied warranties are not entirely private and voluntary, at least to the extent they do not usually constitute the express terms to which contracting parties agree but take effect by fiat once the parties enter into a contract. *Cf. Cipollone v. Liggett Group, Inc.,* —— U.S. at ——, 112 S.Ct. at 2638 (Scalia, J., dissenting) (questioning without answering whether "state law include[s] legal duties imposed on voluntary acts." (internal quotations omitted)). We think them so pervasive and well-known, however, as to be equivalent to expressly agreed to terms and therefore susceptible to the same rule for privately ordered obligations.

■ Even if we incorrectly characterize the nature of implied obligations or misapprehend the extent to which "state law" encompasses, for purposes of federal preemption, legal obligations that are commonly imposed on voluntary acts, we rely on the Secretary of Housing and Urban Development's regulations to reach the same conclusion with respect to Appellee's warranty claims. The regulations conspicuously allow states to "continue in force consumer protections, such as warranty ... requirements." 24 C.F.R. § 3282.11(c)(1994). We think that implied warranties of merchantability and fitness for a particular purpose, which have long been

---

5. In a dissenting and concurring opinion, two Justices reached the opposite conclusion and argued that state "enforcement" obtains when one party invokes the power of the state to enforce a contract. *American Airlines, Inc. v. Wolens,* —— U.S. at ——, 115 S.Ct. at 830–32 (O'Connor, J., concurring and dissenting).

part of the common law of contract and which are embodied in the Uniform Commercial Code, U.C.C. §§ 2–314 (merchantability), 2–315 (fitness for particular purpose), 1A U.L.A. 212, 380 (1989), are among the variations of warranty requirements contemplated by the regulation and therefore are not preempted.

■ Finally, we emphasize the second issue we identified in Appellant's preemption argument, which Appellant raises by relying on *Macmillan v. Redman Homes, Inc.*, 818 S.W.2d at 87. As we explained above, *Macmillan* finds a claim for ambient formaldehyde levels preempted because federal regulations elected to measure formaldehyde emissions from particular products, rather than the overall level found in the air inside a mobile home. Thus, *Macmillan's* language about the extent to which the NMHCSSA preempts state court lawsuits applies only to those lawsuits that plead claims which effectively seek to enforce standards that differ from federal standards. Appellees' claims do not run afoul of federal law in this fashion. They pled mundane and rather general claims for breaches of implied warranties and for deceptive trade practices. Our conclusion that these mundane claims do not attempt to establish safety or construction standards, much less such standards that differ from federal ones, is unaltered by the possibility that some plaintiffs will plead claims that seek to establish safety violations in a manner that is inconsistent with federal safety standards. Appellant's first two points of error are overruled.

## B. Sufficiency of the Evidence

■ In its third, fourth, sixth, and seventh points of error, Appellant challenges the legal and factual sufficiency of the evidence to support various jury findings. In considering a "no evidence" legal insufficiency point, we consider only the evidence that tends to support the jury's findings and disregard all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965). If there is more than a scintilla of evidence to support the questioned finding, the "no evidence" point fails. *Mexico's Indus., Inc. v. Banco Mexico Somex*, 858

S.W.2d 577, 580–81 (Tex.App.—El Paso 1993, writ denied); *United States Fire Ins. Co. v. Ramos*, 863 S.W.2d 534, 538 (Tex.App.—El Paso 1993, writ denied).

■ A factual insufficiency point requires us to examine all of the evidence in determining whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951); *Oechsner v. Ameritrust Texas, N.A.*, 840 S.W.2d 131, 136 (Tex. App.—El Paso 1992, writ denied); *Chandler v. Chandler*, 842 S.W.2d 829, 832–33 (Tex. App.—El Paso 1992, writ denied). The reviewing court cannot substitute its conclusions for those of the jury. If there is sufficient competent evidence of probative force to support the finding, it must be sustained. *Oechsner v. Ameritrust Texas, N.A.*, 840 S.W.2d at 136; *Chandler v. Chandler*, 842 S.W.2d at 833. It is not within the province of the court to interfere with the jury's resolution of conflicts in the evidence or to pass on the weight or credibility of the witnesses' testimony. *Benoit v. Wilson*, 239 S.W.2d 792 (Tex.1951). Where there is conflicting evidence, the jury's verdict on such matters is generally regarded as conclusive. *Montgomery Ward & Co. v. Scharrenbeck*, 204 S.W.2d 508 (Tex.1947); *Oechsner v. Ameritrust Texas, N.A.*, 840 S.W.2d at 136; *Chandler v. Chandler*, 842 S.W.2d at 833.

The object of Appellant's third point of error is the jury finding that Appellant engaged in "false, misleading, or deceptive" practices that were a producing cause of damage to Appellees. Appellant's fourth point of error is directed at the jury finding that Appellant's failure to comply with a warranty was a producing cause of damage to Appellees. Appellant's argument to support its third and fourth points of error is limited to the conflicting testimony about the cause of the fire that destroyed Appellee's mobile home. We therefore similarly confine our analysis.

■ Appellant produced two witnesses who testified that electrical wiring installed by Appellant did not cause the fire, although they were unable to determine what did

cause the fire. Appellee produced one witness who testified that such wiring did cause the fire. This testimony conflicts, and Appellant actually concedes this in its brief. We are not the proper body to resolve such a squarely presented factual conflict. We leave this task, rather, to the fact finder. Appellant's third and fourth points of error are overruled.

Appellant directs its sixth and seventh points of error at the jury finding that the property damage caused by the fire amounted to $79,000. Appellant claims that the record lacks competent evidence of the market value of the mobile home and its contents immediately before the fire.

■■■■■ The measure of damages to personal property is the difference in the market value of the property immediately before and immediately after the injury at the place where the damages occurred. *Pasadena State Bank v. Isaac,* 149 Tex. 47, 228 S.W.2d 127, 128 (1950); *Jalco, Inc. v. Tool Traders, Inc.,* 535 S.W.2d 898, 902 (Tex.Civ.App.—Houston [1st Dist.] 1976, no writ). "Market value" is the price property would bring if it were offered for sale by a willing but not obligated seller and purchased by a willing but not obligated buyer. *Exxon Corp. v. Middleton,* 613 S.W.2d 240, 246 (Tex.1981); *Polk County v. Tenneco, Inc.,* 554 S.W.2d 918, 921 (Tex.1977). A property owner may offer his opinion about the market value of his property. *Porras v. Craig,* 675 S.W.2d 503, 504 (Tex.1984). To do so, an owner need not qualify as an expert who could testify to the value of similar property belonging to another. *Id.* His testimony must, however, show that it is based on "market, rather than intrinsic or some other value of the property." *Id.* at 505.

■■■■■ Appellees concede that the only evidence of the value of the mobile home is testimony that they paid $43,000 for the home when they purchased it new, some ten months before the fire. The historical cost of the home, however, has little bearing on its **market value immediately before the fire.** Indeed, purchase price is ordinarily not even admissible to show market value at a particular later time. *Rosenfield v. White,* 267 S.W.2d 596, 601 (Tex.Civ.App.—Dallas 1954, writ ref'd n.r.e.); *San Antonio Pub. Serv. Co. v. Murray,* 59 S.W.2d 851, 854 (Tex.Civ.App.—Beaumont 1933), *aff'd,* 127 Tex. 77, 90 S.W.2d 830 (1936).[6] Competent evidence of the value of the mobile home will refer both to its market value, as defined above, and will reflect the proper temporal specificity.

■■■■■ There was, however, some evidence of damages. One of Appellees, Mr. Ivy, testified to the market values for the contents of the mobile home. Appellant challenges whether Ivy had the predicate familiarity with market conditions to offer such testimony. Although Ivy equivocated on this issue, we are satisfied that his testimony reflects the requisite familiarity with market values.[7]

---

6. Appellees respond only by arguing that evidence of historical cost was admissible. We do not address this contention or the authorities they cite therefor because Appellant does not challenge the admissibility of any item evidence. It challenges, rather, the sufficiency of the evidence to support the jury's assessment of damages. Thus, with respect to the value of the mobile home, Appellees wholly fail to respond to Appellant's claims.

7. When asked if he knew the prices for which the contents of the house would sell, Ivy responded, "Not really. Other than what price I would put on them." On redirect, however, he effectively contradicted this statement:

Q. [H]ave you ever sold something of yours before?
A. Oh, yes.
Q. Were you able to put a price on it?
A. I sure was. I've sold numerous things.
. . . .
Q. And you have bought lamps, and utensils, and all the things listed there off and on during your life, have you not?
A. Yes.
Q. You have an idea of what they cost in a store?
A. Yes, sir.
Q. You know that if you sell it used, you're going to probably mark it down somewhat . . .?
A. Yes, sir.
Q. And in your lifetime, have you bought used household goods at garage sales, or anywhere else?
A. Yes, I probably have.
Q. And have you . . . occasionally sold used household goods?
. . . .
A. Yes.

While on the witness stand to testify to the market values of the mobile home's contents the trial court instructed him about the meaning of "market value." When Ivy expressed confusion, his lawyer instructed, "I don't want to know what in the best of all possible worlds you would ask ... for any of these items. I want you to tell me what you think it would sell for, what a reasonable person would pay to buy these items at the time just before the fire. Do you understand?" Ivy responded in the affirmative. At worst, Ivy offered conflicting evidence about his knowledge of the market values for the various items lost in the fire. The jury was entitled to resolve this possible conflict in his favor.

■■■ Alternatively, we conclude that evidence of the mobile home's contents need not have been based on their market values. The law of damages distinguishes between marketable chattels possessed for sale purposes and those possessed for the well-being and comfort of the owner. *Crisp v. Security Nat'l Ins. Co.*, 369 S.W.2d 326, 329 (Tex. 1963); *Gannett Outdoor Co. v. Kubeczka*, 710 S.W.2d 79, 89 (Tex.App.—Houston [14 Dist.] 1986, no writ). This is so because "[i]t is a matter of common knowledge ... that used household goods, clothing and personal effects have no market value in the ordinary meaning of that term." *Crisp v. Security Nat'l Ins. Co.*, 369 S.W.2d at 328. The proper measure of damages for this species of property is the "actual worth or value of the articles to the owner ... excluding any fanciful or sentimental considerations." *Id.* Competent evidence of this measure may consist of the owner's opinion testimony. *Allstate Ins. Co. v. Chance*, 590 S.W.2d 703, 704 (Tex.1979). Thus, Ivy's testimony about the values of the mobile home's contents

Q. You'd priced them?
A. Yes.
Q. And they sold?
A. They sure did.

8. This conclusion requires consideration of the numbers involved. The jury assessed damages at $79,000. As we imply above, evidence of damages related largely to two items: the mobile home and its contents. The mobile home was purchased for $43,000. Evidence of the values

constitutes some competent evidence of damages.

■■■ Appellees virtually concede, however, that evidence of the market value of the mobile home itself is totally lacking. Interestingly, the jury charge does not segregate damages to the mobile home from damages to its contents, but asks the jury to assess aggregate damages in a single issue. Because we have determined that evidence of the value of the home's contents constitutes some evidence of damages, the evidence to support the single damages finding is legally sufficient, and we therefore overrule Appellant's sixth and seventh points of error to the extent they challenge the legal sufficiency of the evidence to support the finding. But because we have determined that the evidence of the purchase price of the mobile home is not competent evidence of its market value, we conclude that the evidence is factually insufficient to support the overall assessment of damages,[8] and we therefore sustain Appellant's sixth and seventh points of error to the extent they challenge the factual sufficiency of the evidence to support the jury's assessment of damages.

### C. Exclusion of Warranties and Limitation of Remedies

In its fifth point of error, Appellant claims that it validly limited the warranties it made to Appellees and that it further limited the remedy for any defects in the home to the repair or replacement of the defective item in accordance with sections 2.316 and 2.719 of the Texas Business and Commerce Code. TEX.BUS. & COM.CODE ANN. §§ 2.316 (exclusion of warranties) and 2.719 (limitation of remedies) (Vernon 1994). The conclusion of Appellant's argument in support of this point of error states that the disclaimers and limitations "preclude recovery by [Appellees] in

of the home's contents was adduced when Ivy testified to the market values of items on a long list of personal property destroyed in the fire. Appellees concede, however, that the list has an aggregate value of only $46,605. Our determination that the purchase price of the home is not evidence of its market value means that the only evidence of damages, the list and the related duplicative testimony, establish damages of only $46,605. This, we conclude, is factually insufficient to support the $79,000 verdict.

this case under the theory of breach of warranty." We do not address this point of error because, as Appellant appears to recognize, it attacks only the breach of warranty theory and leaves Appellees' DTPA claim undisturbed.

We recognize that the DTPA allows for recovery thereunder when an implied warranty is breached. *See* Tex.Bus. & Com.Code Ann. § 17.50(a)(2) (Vernon 1987). We further recognize that, despite the DTPA's prohibition on waivers of its protections by consumers, *see id.* at Section 17.42, courts have held that valid warranty exclusion and remedy limitation provisions preclude recovery under the DTPA. *See Southwestern Bell Tel. Co. v. FDP Corp.*, 811 S.W.2d 572, 577 (Tex.1991); *Singleton v. LaCoure*, 712 S.W.2d 757, 760 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). These cases, however, involved causes of action for breach of warranty pled under the DTPA, i.e., causes that depended on the breach of a warranty to serve as the violation of the DTPA. But the DTPA creates a cause of action for a wide variety of proscribed conduct, most of which is unrelated to warranties. *See* Tex.Bus. & Com.Code Ann. § 17.46(b) (Vernon Supp.1995). Contractual limits on liability do not limit recovery for such non-warranty, or "laundry list," violations of the DTPA. *See Martin v. Lou Poliquin Enterprises, Inc.*, 696 S.W.2d 180, 186 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.); *Hycel, Inc. v. Wittstruck*, 690 S.W.2d 914, 922 (Tex.App.—Waco 1985, writ dism'd w.o.j.); *see also Southwestern Bell Tel. Co. v. FDP Corp.*, 811 S.W.2d at 576 ("We agree that a liability limitation would be invalid under Section 17.42 insofar as it purported to waive liability for an act defined as deceptive under Section 17.46(b).").

Appellees pled generic DTPA causes that are not dependent on a breach of warranty. Moreover, even if Appellees pled dependent causes, the case was not tried on a dependent theory. The jury charge contains independent issues that query whether deceptive acts or practices damaged Appellees and whether the failure to comply with a warranty damaged Appellees. The jury answered both in the affirmative. Thus, either cause would have supported the undifferentiated assessment of damages had the evidence been sufficient to support the amount of those damages. Because we remand only to allow the parties to relitigate the **amount** of such damages, and because Appellant raises no complaint about causation or the aggregate damages issue in the jury charge, it is irrelevant whether the damages resulted from one cause or the other. Accordingly, we overrule Appellant's fifth point of error.

### III. CONCLUSION

We sustain only Appellant's challenges to the factual sufficiency of the evidence to support the amount of damages incurred by Appellees. We overrule or need not address Appellant's other claims and therefore affirm the portion of the judgment unrelated to the amount of damages. We reverse the portion of the judgment that assesses damages and remand this cause to the trial court for a new trial limited to the issue of the amount of damages incurred by Appellees.[9]

---

9. Our resolution of Appellant's sixth and seventh points of error makes it unnecessary to address its eighth point of error, which complains of the amount of pre-judgment interest incorporated into the judgment. Appellant claims, and Appellees agree that the judgment incorrectly calculates interest such that the judgment was overstated by $8912.40. We trust that the parties can avoid a similar error on remand without the need for us to now act on the matter.